JAMES DWIGHT TRACEY

*vs.*

STANDARD ACCIDENT INSURANCE COMPANY.

Penobscot.    Opinion April 4, 1920.

*Requirements as to written notice, and filing proof.    Estoppel.    Temporary diversion.*
*Construction of phrase "entire loss of sight."*

This is an action upon an insurance policy combining the phases, both of accident and health indemnity. On the accident side the plaintiff was classified as "select" and described his duties and occupation as "office manager, office duties only," in a business designated as "Lumber."

On the 30th or 31st day of August, 1917, the plaintiff, while riding a motorcycle ran through a swarm of flies or insects, one of which struck his right eye with such force as to give him immediate and continued annoyance and distress, but not sufficient at first to prevent him from the pursuit of his occupation as bookkeeper. It was not long, however, before it so impaired his capacity to work at his usual occupation, that he had to give it up, and pursue a business that did not tax his eye. The eye grew gradually worse until at last it became so blind that he could only distinguish light from darkness, without any ability whatever to distinguish one object from another. In other words the eye became what we call blind and had continued so to the time of the trial, without hope of improvement or recovery. Upon this state of facts the case resolves itself into the following propositions:

1.  Was the injury to the eye accidental within the meaning of the policy?

2.  Was notice of the accident invalid on account of delay?

3.  Was it sufficient, if given in time?

4.  Was the plaintiff engaged in an overhazardous employment?

*Held:*

(1)  That the injury was clearly accidental.

(2)  That the defendant is estopped to deny that the notice was not given in time.

(3)  That the notice was sufficient in law.

(4)  That the plaintiff at the time of his injury was not engaged in an overhazardous employment.

(5)  That he did lose the entire sight of his eye, within the contemplation of the policy.

This is an action of assumpsit upon an insurance policy embracing both accident and health indemnity. Plea, the general issue with a brief statement. The case was tried to a jury. At the conclusion of the evidence, by agreement, it was withdrawn from the jury and submitted to the presiding Justice, with right of exception reserved to both parties. The court ruled against the contentions of the defendant and found for the plaintiff. Judgment for amount claimed. Defendant excepted. Exceptions overruled.

Case stated in the opinion.

*P. L. Aiken*, for plaintiff.

*A. S. Littlefield*, for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, DUNN, WILSON, DEASY, JJ.

SPEAR, J. This is an action upon an insurance policy combining the phases, both of accident and health indemnity. On the accident side the plaintiff was classified as "select" and described in his duties and occupation as "office manager, office duties only," in a business designated as "Lumber."

On the 30th or 31st day of August, 1917, the plaintiff while riding a motorcycle ran through a swarm of flies or insects, one of which struck his right eye with such force as to give him immediate and continued annoyance and distress, but not sufficient at first to prevent him from the pursuit of his occupation as bookkeeper. It was not long, however, before it so impaired his capacity to work at his usual occupation, that he had to give it up, and pursue a business that did not tax his eye. The eye grew gradually worse until at last it became so blind that he could only distinguish light from darkness, without any ability whatever to distinguish one object from another. In other words the eye became what we call blind and had continued so to the time of the trial, without hope of improvement or recovery. Upon this state of facts the case resolves itself into the following propositions:

1. Was the injury to the eye accidental within the meaning of the policy?

2. Was the notice of the accident invalid on account of delay in giving it?

3.   Was notice when given sufficient in substance and form, if given in time?

4.   Was the plaintiff engaged in an overhazardous employment?

5.   Did he lose the entire sight of his eye?

(1)   It is hardly necessary to consume any time to establish the affirmative of the first proposition.   That the injury was accidental is amply proven.

(2)   The second proposition will be discussed upon the assumption that the notice when given, was regarded by the plaintiff and agent as valid and sufficient.

(3)   The defendant contends, that the first notice being, in fact, erroneous, precludes the validity of the future notice by reason of delay.

In the present case the plaintiff within ten days informed Mr. Dyer, the agent of the company, of the accident with which he had met. On September 10th, not exceeding twelve days after the accident, he filled out and delivered to the agent a blank furnished by the company.   This blank was the form to be filled out in case of sickness, instead of in case of accident.   And the plaintiff so filled it out, stating in answer to the question, "What disease disables you?" "Inflamation of the right eye."   This answer we conceive might follow from a condition of the eye produced by an accident as well as by disease.   Hence no evidence is deducible from the answer, which convincingly shows that the plaintiff ought to have distinguished the sickness blank from the accident blank, especially as he had no previous knowledge of either form.

This being the case, we think the plaintiff may have been fully justified in using the wrong blank.—The uncontradicted evidence proves that the plaintiff, before he received the blank, and "within a day or two after the accident." had fully informed Mr. Dyer, the agent, what had happened; to put it in his own language:   "I told him of my accident—told him what it was."

He then, as he testified, proceeded further, and gave the agent every detail of the accident and injury.   Upon this full description the agent said:   "That is all right; if you have a claim, bring it in. That is what we are here for."

"In the next three or four days we had gone over the thing several times."   He says:   "You better get your claim in on time."   The plaintiff said "I will go right to your office and make it out now."   In

regard to making out the notice the agent said: "Do as well as you can. We don't know the result. It is up to the company to come back and find out what was the matter." Thereupon, the agent, of his own volition, without any request from the plaintiff "reached in his drawer and gave me that blank." There was evidently no purpose or disposition on the part of the agent to mislead or defraud. He simply made a mistake but his mistake was the mistake of the company as will later appear.

Assuming still that both parties regarded the notice as proper in form the plaintiff, then had the same right to rely upon it as if it was proper in form, until the contrary appeared.

Matters stood in statu quo until the eighth of February following, when the plaintiff as he states it: "Made a formal report and the application on February 8th and explained fully the whole details to the company, and right away after that as I remember it, they sent me the blanks."

This communication called a report, is prefaced by the following statement: "You have already been advised that claim was to be made under policy A D C -R 2075, delay being due to the fact that the ultimate result of the accident was uncertain. The time has now come, when the condition seems reasonably definite and final." Then follows a detailed statement of the accident, the cause, the injury, the progress, impairment of the sight of the eye, the treatment and the final result.

This report, and, it may be here said, all other papers given to the agent, were at once forwarded by him to the company.

After making this report the plaintiff received blanks for proof of claim, as near as may be ascertained from the record, about March 6. About this time, probably upon receipt of the blanks, the plaintiff discovered "That the health blank was not what he wanted." We place no stress in the decision of this case upon the legal construction that the sending of the blank proofs was a waiver on the part of the defendant, of any question of liability.

On March 25th, the plaintiff sent to the agent a proof of claim or notice upon the accident blank furnished by the company.

From the rehearsal of the facts we are of the opinion that the voluntary production of the health blank on September 10th, by the agent, was the act of the company. The agent knew all the facts, in detail, of the injury, and, in law, is charged with knowledge that the blank

was the wrong one. The company is charged with the knowledge of of the agent. *Thorne* v. *Casualty Co.*, 106 Maine, 274, and cases there cited. The plaintiff had a right to rely on the agent to furnish him with the proper blank. R. S., Chap. 53, Sec. 119, applies.

As was said in *Leblanc* v. *Standard Insurance Co.*, 114 Maine, 6: "There is no limitation in the statute and we perceive none in the reason of the thing.

The statute recognizes what common experience teaches. Men commonly do all their insurance business with agents. They have no direct dealings with the companies. . . . . They go to agents when losses have occurred, and pursue the steps pointed out by them in proving the loss." This is precisely what the plaintiff did. He was led into error and consequent delay by the act of the agent, in furnishing the wrong blank.—The error, however, in filing the sickness blank may be regarded, not inappropriately, as a mutual mistake. The agent mistook the proper form of blank, else his act was a fraud. The plaintiff confided in the honor and knowledge of the agent, who knew all the facts, to furnish him the proper blank. Hence the plaintiff's mistake. But a mutual mistake always excuses. It therefore follows that the only effect of the first notice purporting to be a proof of disease instead of injury, although believed to be right, was to operate in causing a reasonable excuse for mutual delay upon the part of both the plaintiff and defendant.

It would be clearly wrong for the defendant to have the advantage of this delay to the detriment of the plaintiff, under the admitted facts of the case. The company knew that it was a case of accident, not of disease; of injury, not of sickness; that it required an accident, not a health form of notice; voluntarily furnished the form; intended the plaintiff to act upon it; received the notice; retained it; made no objection; requested no further information; had full opportunity to examine the form of blank before furnishing it; was in duty bound to see that it was correct, and not misleading; in fine, knew all the facts, regardless of any form of notice. Whatever the intention, in voluntarily passing out the wrong form, it lead the plaintiff to do to his injury what he would not have done but for the negligent act of the defendant by its agent. The plaintiff by this act was induced to do what defeated the entire indemnity of his policy, if the plaintiffs contention prevails, and inured in equal measure to the benefit of the company. We have already noted that the plaintiff was not at

fault; that he had a right to rely on the conduct of the agent. We are accordingly of the opinion that the doctrine of estoppel aptly applies. The very essence of estoppel is to prevent a party from taking advantage of misleading another party to his injury, when injury will result if estoppel is not declared. 10 R. C. L. Estoppel, Section 25. The law will not stand by in silence and see one party mislead another to his injury, whether by ignorance, negligence or design. 10 R. C. L. Estoppel, Section 24, upon this point says: "Yet ordinarily he will be estopped though he has acted or spoken in forgetfulness or ignorance of the facts, particularly when he had the means at hand of knowing all the facts, or when he was in such a position that he ought to have known them." This case therefore comes directly within the rule of negligence, that when one of two innocent parties must suffer, he whose negligence caused the injury must bear the burden. In 10 R. C. L. Estoppel, Section 23, this rule is thus stated: "This is an application of the general principle that when one of two innocent persons, that is, persons each guiltness of an intentional, moral wrong, must suffer a loss, it must be borne by that one who by his conduct has rendered the injury possible."

An erroneous notice, given upon an erroneous form, furnished by the error of the one producing it, and misleading the one required to give it, to the belief that it is correct, may be relied upon by such person as correct and fulfilling the office for which it was required to be given, until such error is detected.

We are therefore of the opinion that the defendant is estopped to deny that the paper, filed March 25 upon the proper form of blank, was seasonably filed, under the law and the facts as disclosed in this case.

3. Was the accident blank of March 25th, as finally filled out and executed, in accordance with the requirements of the policy and sufficient in law? As seen, the blank was furnished by the company, filled out by the plaintiff, delivered to the agent and sent to the company, which received it, according to the notation on the blank, March 29th. The plaintiff also sent affidavits of his employer, and the physicians who attended him, explaining, in every detail, the beginning, progress and result of his injuries.

The company did not return the paper purporting to be proof or notice of the accident and injuries, nor request any further information. It must be held, therefore to have waived all informalities and deficiencies.

We are of the opinion that the final proof or notice was sufficient.

4. Was the plaintiff at the time of the accident and injury engaged in an extra hazardous or forbidden employment?

There is no contention in the case that the plaintiff had changed his employment as a bookkeeper to the vocation of a motorcycle rider. He was using his motorcycle for exercise and pleasure. It is well settled that a temporary diversion from that stated, is not held to be an engagement in a more hazardous employment, unless plainly stated in the contract. This question is fully discussed in *Thorne* v. *Casualty Co.*, 106 Maine, 274.

Paragraph A. (1) of the policy before us is identical in meaning, and almost so in language, with Article 3, of the policy considered in the Thorne Case,—quoting *Eaton* v. *Insurance Co.*, 89 Maine, 570,— in which it is said: "This provision (3) relates to the occupation, employment or business—a vocation and not an avocation, occasional, exceptional and outside his regular vocation." The reasons for the rule are also discusesd in that opinion.

But it would seem unnecessary to revert to rules of interpretation to find that the plaintiff, in the case at bar, was exempt from the "more hazardous" clause, as the paragraph in which it is contained, expressly excepts him therefrom when engaged in the "Ordinary duties about his residence, or while engaged in recreation." But defendant urges, although it may be regarded as a temporary diversion, and not construed as overhazardous, under the doctrine of the Thorne case, that, nevertheless, riding a motorcycle, is specified, by reference, in the plaintiff's policy, as an occupation, though temporary, that changes the classification of his risk from "special" to "medium" and correspondingly, either reduces the amount recoverable in case of an accident, or requires a motorcycle permit at an increased annual premium. The langugage in the policy claimed to work this modification is a part of the last paragraph of the provision designated as A-(1) and reads as follows: "If the law of the state in which the insured resides at the time this policy is issued requires that prior to its issue a statement of the premium rates and classification of risks pertaining to it shall be filed with the state official having supervision of insurance in such state, then the premium rates and classification of risks mentioned in this policy shall mean only such as have been last filed by the Company in accordance with such law."

To carry this clause into effect a red book is offered, the contents of

which, excerpts from pages 4, 41, 67, and 85, it is claimed are required by statute to be filed with the insurance commissioner, and thereby become official. The statute requirement is as follows: "No policy of insurance . . . . shall be issued or delivered . . . until a copy of the form thereof and of the classification of risks and the premium rates pertaining thereto have been filed with the insurance commissioner."

From an inspection of the red book it will be observed that the parts offered to show a modification, contain matters of instruction to its agents, are not required to be filed with the insurance commissioner, and, to become effective should be put in force by riders, attached by the agents, at the time the policy is written. The book is denominated: "The Red Book and Agent's Rate Book (Third Edition) A Book of Ready Reference on all points connected in any way with the soliciting and sale of the personal accident and sickness Policies of the company. Compiled and published in the interest of its agents."

The caption of page 3, is: "General Instructions." Under this caption is found a paragraph on page 4, headed: "Prohibited Risks," which is the paragraph offered to show the modification claimed to be contained, by reference, in A-(1), and reads as follows: "Persons who are blind in both eyes, deaf, compelled to use a crutch or cane, insane, demented, feeble-minded, subject to fits; who have lost a foot or leg, who have suffered paralysis or are paralyzed, who are notoriously intemperate, reckless, disreputable, or without visible means of support, are not to be insured under any terms. Riders of motorcycles will not be insured unless in connection with the motorcycle permit described under heading "Riders."

Although the last sentence only refers to motorcycle riding we have quoted the whole paragraph to show how conclusively it appears to be nothing but an instruction to the agent, as it emphatically instructs him not to insure a blind man at all, nor a motorcycle rider, except upon a permit, as appears from page 41, which is offered by the defendant as the complement of page 4.

Upon page 41 of this red book is found this Caption: "Riders or Supplementary Agreements." Under this is a paragraph headed Motorcycle Permit. This paragraph is offered and relied upon to carry into effect, by reference, the paragraph on page 4. But instead of giving it effect it gives it an express negation. The paragraph on

page 41 explicitly instructs the agent not to issue a policy "unless this contingency (riding a motorcycle) be provided for by the attachment to the policy of one of the two following endorsements." As neither was attached they became nugatory as far as the present contract is concerned.

It further appears from this paragraph that it does not apply to the present case as only "where it is known (to the agent or company) that the insured uses a motorcycle that the company will not issue." In the present case this fact was not known as the plaintiff did not at the date of the policy use or own one of these machines. There is no requirement that the insured shall inform the company of taking up such use, for recreation or pleasure. Furthermore it should be observed that the only reference to a motorcycle in this contract, is an inhibition to use it in "a race or speed contest," plainly warranting the inference that the assured could use it in any other way. The rule of exclusio might well apply.

Nor does the record show that a word ever passed between the plaintiff and the agent concerning the use of a motorcycle, as prescribed in the red book, or any other way, whereby the plaintiff had any knowledge whatever of any objection to the use he was making of it when injured. The red book, pages 4 and 41, contains instructions only to the agent, and in no sense relates to or modifies the language of this or any other contract, unless attached as riders to the policy.

Pages 67 and 85 are but tables of rates and have no relation whatever to the modification of the plaintiff's contract.

But the red book was the only evidence offered in defense. We are therefore of the opinion that the plaintiff was not engaged in an overhazardous occupation, nor violating any of the terms of this contract, while temporarily riding a motorcycle.

R. S., Chap. 53, Sec. 11, contains this Caption: "Standard Provisions for Accident and Health Insurance Policies." Section 12. "Conditions under which policy may be issued." Under this section five conditions are imposed, all enacted for the protection of the policy holder against deception, misunderstanding or fraud, of which the following is one: "No. (5). Unless the exceptions of the policy be printed with the same prominence as the benefits to which they apply; provided however that any portion of such a policy which purports, by reason of the circumstances under which a loss is incurred to reduce any indemnity, promised therein, to an amount less than

that provided for the same loss, occurring under ordinary circumstances, shall be printed in bold faced type, and with greater prominence than any other portion of the text of the policy." The latter part of sub-division (5) relates specifically to an exception that has, for its purpose, a change that reduces the amount of the indemnity named in the policy and applies directly to the exception claimed in the case at bar.

In view of the object and purpose of this explicit statute, the legislature undoubtedly intended that any exception contained in the policy should be so conspicuously printed that it would attract the attention of the insured and so plainly expressed as to leave no doubt as to its meaning and application. In other words the exception should refer, in terms contained in the policy, to the subject matter to which the exception is intended to apply, so that the insured may at least, be put upon inquiry, as to what, under the exception, he is to do or not to do, in order to preserve the integrity of his indemnity, and prevent any diminution thereof, which is to him the chief object of his contract. We do not believe that a "red book" deposited in the archives of the insurance department, at the State House, requiring a pilgrimage to that shrine to find, and an examination of its contents to discover, if possible, the import of the exceptions, scattered upon pages 4, 41, 67 and 85, as the pages referred to in the offer of the red book as evidence, meets the requirement of the statute.

Regardless of any statute, it was held in *Miller* v. *Missouri State Life Insurance Co.*, 153 S. W., 1080 (Missouri Court of Appeals) as expressed in the syllabus: "To make the manual of an accident insurance company, defining the classification of risk etc., a part of the contract of insurance it should have been plainly referred to therein, and made a part thereof, or should have been actually written into the contract." We are accordingly of the opinion, that paragraph A. (1) of the policy fails to comply with the requirement of the statute, or the interpretation to be given by the common law, so far as it is invoked as an exception intended to affect a reduction of the plaintiff's indemnity, under the present state of facts.

5. Finally, did the plaintiff suffer the "entire loss of sight" of his eye? This depends upon the condition of his eye and the interpretation of the word "entire". Dr. Woods described the condition as follows: "Q. Will you tell the jury, in simple language, what condition you find his eye in now?

A. Mr. Tracey's vision is no better than it was when I saw him last February. He has no perception of color. He, by holding a bright red glass before his eye, or between his eye and a bright light, he couldn't tell—I had two, in fact three glasses, a yellow glass, a blue one and a red one; he couldn't tell the color of those glasses, whether it was red, blue or yellow. I carried my hand back and forth across his eye, with his left eye entirely covered from the light, and he couldn't see my hand go back and forth by the eye, in my office."

The meaning of the word "entire" should be determined in the light of the purpose and intent of the policy; why the plaintiff bought it; and with a construction most favorable to him. The intent and purpose of the policy as a business proposition was to indemnify the plaintiff for the complete loss of, or "entire" use of, his eye. The "loss of the entire sight" of an eye, and the loss of the entire use of an eye, by blindness, in practical effect, are precisely the same. Being a business contract, this policy should be construed, like any other contract, with reference to the object, purpose, conditions and circumstances.

The eye has earning capacity as well as the hand. To indemnify the complete loss of the sight of the eye as an earning factor was undoubtedly one of the controlling reasons for taking the policy.

We feel that it would be unfair to the company as well as the plaintiff, to impute to it the intention, by the artful employment of a word, to base its liability upon the frail and frivolous distinction between ocular ability to discriminate a flood of light from total darkness, and without the power to distinguish one object from another in the strongest light.

We have little doubt that the company used the strong word "entire" to protect itself against any possible fraud, regarding the degree of vision, that might be claimed to come within the terms of the policy, short of what might be declared a total loss of sight, based upon inability to see or distinguish one object from another. Accordingly the phrase "loss of entire sight," should be so construed as to give the plaintiff what he bought and paid for, and not to defeat the whole purpose and intent of the contract. It should be held to mean that the entire loss of the use of an eye from blindness is a loss of the entire sight of that eye. But if technicalities were to be invoked, then the meaning of the word "sight" becomes as important as the meaning of the word "entire." Sight is defined in Webster's Stand-

ard Dictionary:   (1)   The power of seeing; the faculty of vision or of perceiving objects.   (2)   Act of seeing; perception of objects by the instrumentality of the eyes; view.   To see is defined:   To perceive with the eye; to have knowledge of the existence and apparent qualities of by the organs of sight; to examine with the eyes; to behold;   descry;   view;   observe;   inspect.   It is too plain   for further discussion that the plaintiff had met with an entire loss of power to "see," to "behold," "descry," "view," "observe" or "inspect," as these terms are defined.

He had therefore met with a loss of entire sight, according to the etymology of the words "entire "and "sight", as employed in the policy.

This interpretation is supported by authority as well as reason.

*International Travellers' Association* v. *Rogers*, 163 S. W., 421, holds that "entire" does not mean total blindness, but is sufficient if the insured had practically lost the sight of the eye.   *Murray* v. *Aetna Life Ins. Co.*, 243 Fed. Rep., 285 is precisely in point.   "An accident policy providing for payment for the loss of the entire sight of an eye, if irrevocably lost, should be reasonably interpreted; and the sight of an eye will be deemed lost, where there is no ability to distinguish and recognize objects, though light from darkness can be distinguished," is the language of the rescript which accurately states the result of the opinion.   It is further said in the opinion, "If this ability is so far destroyed that what remains will not to practical and useful extent confer any of this benefit, entire sight, within the construction of analogous terms in insurance law, is lost.   So would it be in popular phrase or sense.   The interpretation must be reasonable and relative not literal.   The ability to perceive light and objects but no ability to distinguish and recognize objects, is not sight, but blindness."

We are of the opinion that the plaintiff lost the entire sight of his eye within a rational and practical interpretation of the language of the policy.

*Exceptions overruled.*