139 So.2d 619

**INDEPENDENT LIFE AND ACCIDENT INSURANCE COMPANY**

v.

**Ernest WIGGINS.**

**1 Div. 849.**

Court of Appeals of Alabama.

Nov. 14, 1961.

Rehearing Denied Feb. 27, 1962.

John M. Coxwell, Monroeville, for appellee.

H. T. Fitzpatrick, Jr., Montgomery, and Windell C. Owens, Monroeville, for appellant.

CATES, Judge.

Mr. Wiggins took out a "General Accident Death Policy" issued by Independent March 29, 1954. Independent promised to pay him one-fourth the principal sum if he should suffer the loss of one eye "solely as a result of an accident after the effective date." The policy defined loss of an eye as "the permanent loss of the sight thereof."

Mr. Wiggins, in 1957, caught a cotton hook under his left eye. He went to Dr. Francis Nicholas for treatment. Later in 1958, he testified, he struck his right eye on a piece of brush which he had picked up while working in his garden.

In May, 1958, Dr. Jack R. Hays removed Mr. Wiggins's right eyeball. The jury awarded Wiggins $700.

Dr. Nicholas had not seen Wiggins before 1957. On that examination, he testified, Mr. Wiggins gave him the following history on his right eye:

(a) "He said that he was blind in his right eye."

(b) "He said his right eye was blinded traumatically 27 years ago by a piece of wood—traumatically means blow."

(c) "According to his history he was [completely blind] John."

(d) "* * * but according to his history John, he was blind period."

Dr. Nicholas, from his own examination of Mr. Wiggins's right eye in 1957, was unable to give an opinion as to the extent of the defective sight. His cross-examination went:

"Q. Now doctor when he came to you first in '57, did you ask him could he distinguish light with his right eye? A. I don't remember. If I did I didn't have it noted here.

"Q. From your examination of that eye in your opinion could he have dis-

tinguished a bright object with that eye? A. That is something that you can't tell looking at the back of person's eye—you can tell if he has living cells or apparently living cells in the retina—that is the back of his eye. That's the only thing you can tell—as to whether he can perceive light with those cells, you can't say.

"Q. That would be left to the individual more or less himself? A. That's right."

And R. 18 shows:

"Q. Do you know of your own knowledge that Ernest was completely blind in that eye doctor? A. According to his history he was John.

"Q. But in your opinion is it still possible for him to have perceived light?

"Mr. Fitzpatrick: We object to that.

"The Court: I sustain the objection to the light—you can question him on objects.

"Q. Would he have been able to have perceived an object—a bright object? A. I don't believe so John, not as an object.

"Q. Could he have been able to perceive some light would you say?

"Mr. Fitzpatrick: We object to that.

"The Court: I overrule the objection.

"Mr. Fitzpatrick: We except.

"A. Do you mean to distinguish it as some light as such, or as a light from any source?

"Q. Well just as a bright light?

"Mr. Fitzpatrick: Judge we object to that.

"The Court: I overrule the objection.

"Mr. Fitzpatrick: We except.

"A. If we are going to assume that he has living cells back there, you've got to assume that he might possibly could have perceived strong light, but according to his history John, he was blind period.

"Q. But you could not determine from your examination whether he had live cells back there or not could you? A. He did have, when I examined the back of his eye, he had blood vessels that were still viable, but of course you couldn't tell,—

"Q. But ordinarily doctor, a man having an eye in that condition,—would it have remained in his head for 26 years? A. Well many of them do.

"Q. And it would not have been painful? A. Not necessarily, unless he came up with one of these glaucoma type conditions that sometimes occur."

From the cross-examination of Mr. Wiggins, we excerpt the following:

" * * * can you distinguish objects—well you couldn't distinguish objects before could you? A. Yes sir.

"Q. You just said you could see whether it was light or dark—you could see whether it was light couldn't you? A. I could see whether it was light or dark and I could know something was in front of me.

"Q. But you couldn't tell what it was? A. No sir.

"Q. Couldn't distinguish a table from a dresser, or an automobile from a truck could you? A. No."

The court charged the jury in part:

"Gentlemen of the jury it is the law in the State of Alabama, and has been held by the court that the loss of an eye means the loss of the sight of the eye and the question for you to determine —and the sole question for you to determine, is whether or not this plaintiff Wiggins lost the sight of his eye prior

to the issue to him of this policy. It is the law in the State of Alabama that the mere fact that somebody can distinguish between daylight and dark that doesn't give him eyesight. In other words, the loss of the ability to distinguish objects is the thing that the law speaks of when it speaks of eyesight, and as I say that's the sole question for you to determine in this case. If you are reasonably satisfied of that —and I charge you that the burden is on the plaintiff and not on the defendant to reasonably satisfy you from the evidence that this plaintiff had eyesight making him able to distinguish objects before his eyes at the time the policy was issued and not merely the ability to distinguish between light and dark."

He also gave the following written charges for Independent:

"2. The Court charges the jury that if you are reasonably satisfied from the evidence in this case that at the time the policy sued upon was issued, plaintiff had permanently lost vision in his right eye to the extent that he could only distinguish between light and dark with that eye, then you cannot find for the plaintiff.

"3. The Court charges the jury that if you are reasonably satisfied from the evidence in this case that at the time the policy sued upon was issued, the plaintiff had permanently lost the vision of his right eye, then you cannot find for the plaintiff.

"4. If the vision in a man's eye has been reduced to the point that he can only distinguish light from dark with that eye, then as a matter of law he has lost the vision of that eye."

The appeal is presented via Independent's argument of four assignments of error, viz.:

"2." Overruling Independent's demurrer to Wiggins's special replication;

"3." Permitting (over objection) Dr. Nicholas to testify that Wiggins could perceive light with his right eye;

"4." Refusing the affirmative charge with hypothesis; and

"5." Denying Independent's motion for a new trial.

By his special replication Wiggins purported to set up a statutory "estoppel" under § 3(A) (2) (b) of Act 193 of July 16, 1953:

"(b) No claim for loss incurred or disability (as defined in the policy) commencing after three years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage by name or specific description effective on the date of loss had existed prior to the effective date of coverage of this policy."

The oral charge ignored the effect of § 3(A) (2) (b), supra, nor did Wiggins ask for a written charge thereabout. Thus, the issue was framed without reference to the special replication and the assignment is on a moot point. We are shown no hurt or prejudice to the appellant. Louisville & N. R. R. Co. v. Bargainier, 168 Ala. 567, 568, 53 So. 138 (favorable rulings eliminating counts cannot be reviewed); Going v. Alabama Steel & Wire Co., 141 Ala. 537, 37 So. 784.

Thus, when Wiggins's counsel moved, by reason of § 3(A) (2) (b), supra, to exclude Dr. Nicholas's testimony, the trial judge denied the motion and stated that he doubted the pertinency of the provision to this case, a doubt which the writer shares.

Assignment 3 follows:

"The Court erred in admitting in evidence, over the apt objection and exception of appellant, the testimony of the witness Dr. Francis Nicholas that appellee prior to the accident could have perceived light with his right eye. (R. 18)"

The only answer on page 18 of the record which seems to fit is contained above, i. e., Dr. Nicholas's answer:

"If we are going to assume that he has living cells back there, you've got to assume that he might possibly could have perceived strong light, but according to his history John, he was blind period."

We think the insistence of error is inconsistent since the perception of light is one component of vision.

A reading of Locomotive Engineers' Mutual L. & Acc. Ins. Co. v. Meeks, 157 Miss. 97, 127 So. 699, cited by appellant, shows that if a man cannot perceive light near his eye he is blind. Some writers call this state "absolute" blindness. If lack of light perception is undisputed, there would be no need for testing the ability to perceive or distinguish objects. To permit questioning as to this basic ability seems axiomatically correct.

Assignment 4 (refusal of affirmative charge) we consider not well taken because: (1) Dr. Nicholas's opinion was based on an assumption of what Wiggins meant when he told him he was blind. (2) Wiggins's cross-examination is capable of being understood to mean that he could distinguish objects before.

We have noted that Mr. Wiggins executed the proof of loss form with his mark, worked as a day laborer and testified that he didn't read very well. These circumstances could, in our opinion, reasonably be considered as bearing on how precise Mr. Wiggins might use the term "blind."

Webster's dictionary gives 21 definitions for the adjective "blind," the first of which is "destitute of the sense of sight." We find under "sight" (the word used in the policy):

"6. a The process, function, or power of seeing; the special sense, whose end organ is the eye, by which the position, shape, and color of objects are perceived or received as stimuli through the medium of light proceeding from them; eyesight; vision."

The question on cross-examination, "Couldn't distinguish a table from a dresser," might have been pertinent had it referred to the amount of light and the distance, but when coupled with the ability to distinguish between a car and a truck became too ambiguous to have probative value.

We view Dr. Nicholas as having given no expert opinion as to Wiggins's right eyesight in 1957, except as to his observance of some viable cells. Should we, however, be mistaken in this, yet we feel Independent was not due the affirmative charge because Dr. Nicholas unequivocally admitted that as to Wiggins's pre-1957 eyesight he could only go by both (a) the observation of viable cells, and (b) what his patient told him.

In this record we find no evidence of Dr. Nicholas asking Wiggins if, on March 29, 1954, or in 1957, or in 1958, he could distinguish objects at particular distances.

We quote from Simpson, J., in Police & Firemen's Ins. Ass'n v. Mullins, 260 Ala. 173, 69 So.2d 261, 263:

. "* * * defendant strongly relies upon our decisions holding the affirmative charge with hypothesis should·be given upon the clear, unimpeached and uncontradicted evidence of expert witnesses, such as practitioners of the medical profession, rested on facts ascertainable by the aid of instruments, learning and experience—facts outside the knowledge of laymen. Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755; New York Life Ins. Co. v. Zivitz, 243 Ala. 379, 10 So.2d 276, 143 A.L.R. 321.

"But the weight of such testimony is subject to all the rules appertaining to the testimony of other witnesses within the realm of their knowledge. And the jury is not bound by the testimony of such experts unless uncontradicted and pertaining to subjects for experts alone. Commonwealth Life Ins. Co. v. Harmon, supra; Pollard v. Treadwell, 234 Ala. 615, 176 So. 452."

We fail to find the expert witness showing he alone can tell whether his patient could distinguish between objects. See also Vulcan Life & Accident Ins. Co. v. Standifer, 266 Ala. 246, 97 So.2d 568 (a strong case because by the entire court rather than a division).

The contrasts given by the North Carolina court in Brinson v. Old Republic Life Ins. Co., 247 N.C. 85, 100 S.E.2d 246, 248, show judicial efforts in formulation of a meaning for the loss of eyesight:

"The appellee seeks to sustain the nonsuit upon the authority of Bolich v. Provident Life & Acc. Ins. Co., 205 N.C. 43, 169 S.E. 826, 827. In that case the plaintiff testified: 'I cannot see to read with my right eye (the injured member) * * * I can see large objects close to me, but I cannot look at any ordinary object through my right eye for any length of time. The object will blur, but by continually batting my eyes, I can see the object. * * * The sight of my right eye is not entirely gone.' In ordering a new trial, this Court said: 'There was no evidence tending to show that the bodily injury sustained by the plaintiff resulted in the loss of an eye which resulted in the irrevocable loss of the entire sight thereof.'

"In this case the plaintiff testified he is totally blind in his injured eye, though he later qualified the statement by saying he could perceive a little light in bright sunshine. His doctor testified: 'In my opinion the injury received from the fall caused blind-

ness in his left eye. * * * I believe the condition in his left eye will be total and permanent.'

"The case at bar and the Bolich case are, therefore, readily distinguishable. We think the entire sight of an eye is lost when neither objects, nor forms, nor colors can be distinguished in strong light, although sufficient perception remains to disclose 'a little light when the sun is shining.' In practical effect, loss of sight is not rendered less complete by reason of ability to perceive no more than a flicker of light in a bright sun. The plaintiff's evidence was sufficient to entitle him to have the jury pass on it.

"Reversed."

In the instant policy, we have a contractual definition, "the permanent loss of the sight." Judge Bourquin, in an oft-cited decision, where a policy provided for payment on "loss of entire sight * * * irrevocably," points out that the jury were charged "that, though the injured eye could 'distinguish light from darkness, or perceive objects temporarily, for brief intervals,' yet, if 'all useful and practical sight was irrecoverably lost,' it was within the policy and plaintiff was entitled to recover." Murray v. Aetna Life Ins. Co., D.C., 243 F. 285.

Judge Bourquin's opinion on motion for new trial continues:

" * * * The indemnity is virtually for the loss of the benefit of sight or vision. The latter may be defined as the ability to perceive, distinguish, and recognize objects, and the former as satisfaction of will, need, or pleasure. If this ability is so far destroyed that what remains will not be practical and useful extent confer any of this benefit, entire sight, within the construction of analogous terms in insurance law, is lost. So would it be in popular phrase or sense. The interpretation must be reasonable and relative, not literal. The ability to perceive light and objects, but no ability to distinguish and recognize objects, is not sight, but blindness. So would it be, though there were intermittent flashes of the latter ability. To no practical or useful extent would it serve the will, need, or pleasure.

* * * * * *

" * * * It is not enough that sight may be so far lost and the eye so impaired that he is disabled to perform major operations, or to read continuously, or that, when he closes the uninjured eye, the injured one loses vision, or that natural co-ordination and accommodation are lacking; for defendant did not contract to pay upon the happening of any or all these contingencies, but only when entire sight was lost—when all practical and useful sight for any purpose of will, need, or pleasure was lost.

* * * * * *

" * * * But it is loss of sight as a man, and not as a doctor, that this term of the policy applies to. * * *" from Murray v. Aetna Life Ins. Co., D.C., 243 F. 285.

We quote also from Tracey v. Standard Accident Ins. Co., 119 Me. 131, 109 A. 490, 494, 9 A.L.R. 521:

"We feel that it would be unfair to the company, as well as the plaintiff, to impute to it the intention, by the artful employment of a word, to base its liability upon the frail and frivolous distinction between ocular ability to discriminate a flood of light from total darkness, and without the power to distinguish one object from another in the strongest light.

"We have little doubt that the company used the strong word 'entire' to protect itself against any possible fraud, regarding the degree of vision, that might be claimed to come within the terms of the policy, short of what might be declared a total loss of sight, based upon inability to see or distinguish one object from another. Accordingly, the phrase 'loss of entire sight' should be so construed as to give

the plaintiff what he bought and paid for, and not to defeat the whole purpose and intent of the contract. It should be held to mean that the entire loss of the use of an eye from blindness is a loss of the entire sight of that eye. But if technicalities were to be invoked, then the meaning of the word 'sight' becomes as important as the meaning of the word 'entire.' 'Sight' is defined in Webster's Standard Dictionary: (1) The power of seeing; the faculty of vision or of perceiving objects. (2) Act of seeing; perception of objects by the instrumentality of the eyes; view. To 'see' is defined: To perceive with the eye; to have knowledge of the existence and apparent qualities of by the organs of sight; to examine with the eyes; to behold; descry; view; observe; inspect. It is too plain for further discussion that the plaintiff had met with an entire loss of power to 'see,' to 'behold,' 'descry,' 'view,' 'observe,' or 'inspect,' as these terms are defined.

"He had therefore met with a 'loss of entire sight,' according to the etymology of the words 'entire' and 'sight,' as employed in the policy."

With these illustrative analogies before us, let us now recapitulate the problem presented on trial below. Mr. Wiggins showed undisputedly that he had lost permanently the sight of his right eye. When and how were the two open questions.

Under Mr. Wiggins's theory he had brushed his eye and this led within ninety days (the connective period in the policy) to removal of the eyeball by enucleation.

To counter this theory of total loss due to an accident, Independent advanced two lines of proof, viz., (1) Dr. Nicholas's testimony of Wiggins's relating the history of the old injury together with Dr. Nicholas's examination, and (2) purported admissions in Wiggins's cross-examination.

Independent had, in effect, to prove a special issue, the loss of eyesight before the 1958 accident, either before the policy date by any means or after the policy date by disease or other nonaccidental means.

■ The nonexistence ab initio of a thing which is otherwise capable of being covered against risk, ordinarily prevents the insurance from attaching to the object. Continental Ins. Co. v. Dotson, 260 Ala. 499, 70 So.2d 796; Union Marine & General Ins. Co. v. Holmes, 249 Ala. 294, 31 So.2d 303; Barry v. Aetna Ins. Co., 368 Pa. 183, 81 A.2d 551; Kline Bros. & Co. v. Royal Ins. Co., C.C., 192 F. 378; Alliance Ins. Co. v. Continental Gin Co., Tex.Com.App., 285 S.W. 257, modified as to interest, Tex.Com. App., 287 S.W. 244.

There appears to be no generally accepted definition of blindness, certainly not as a matter of law. Apparently, also, medical writers fail to use the term with the precision of the terms 20/20 or 20/200 or the like.

Thus we find in an article by F. M. Foote, M.D., on "Blindness" in Traumatic Medicine and Surgery for the Attorney (Butterworths, Washington, D. C.), Vol. 4, pp. 1, 3–4:

"The average person thinks of blindness in terms of Noah Webster's dictionary definition as 'total absence of sight'. Yet only 30 per cent of recipients of aid to the needy blind from public welfare departments in the United States fall within this narrow definition—most have at least light and motion perception, and many can count fingers at arm's length. Most countries have a far more strict definition of blindness than does the United States, and even within this country there is some variation among the different states.

\* \* \* \* \* \*

"2. Determination of Blindness ¶ 572

"For purposes of aid to the needy blind the federal bureau of Public Assistance in the Department of Health, Education and Welfare suggests that state welfare departments use a defini-

tion that received the formal approval of the American Academy of Ophthalmology and Otolaryngology in 1936. ' * * * central visual acuity of 20/200 or less in the better eye with correcting lenses is considered as economic blindness. * * * An individual with central visual acuity of more than 20/200 in the better eye with proper correction is usually not considered blind unless there is a field defect in which the peripheral field has contracted to such an extent that the widest diameter of visual field subtends an angular distance no greater than 20 degrees.'

"Most states use the above definition with minor modifications in their welfare programs, and the Internal Revenue Service in the U. S. Treasury Department uses it in granting an extra income-tax deduction to persons classified as 'blind'.

"For educational purposes this definition of economic blindness is unsatisfactory, because there are many boys and girls with less than 20/200 visual acuity who can use large-print books and other aids which enable them to be educated as 'seeing' children—all who can be educated in this way but whose visual acuity in the better eye with correcting lenses is 20/70 or less being classified in educational circles as partially seeing.

"For many years the Section on Ophthalmology of the American Medical Association has had committees studying the appraisal of loss of visual efficiency in relation to cases involving workmen's compensation. The latest report was adopted in 1955 and provides detailed procedures for assessing the competent of four physiologic functions of vision including: (a) corrected visual acuity for distance and near; (b) visual field; (c) ocular motility and absence of double vision; and (d) binocular vision.

"In talking about vision most of us err by thinking only of keenness or acuity of sight. Although this is perhaps the most important function, vision is defective unless the other factors are normal and properly coordinated."

The text, in a footnote on page 3 (Vol. 4), defines visual acuity:

"Visual acuity—visual acuity is tested by showing the patient letters on a card placed at a distance of 20 feet. A normally sighted person should be able to see the letters of certain size, such vision being described as 20/20. The largest letters are of such a size that they should be visible at 200 feet and a patient who can only distinguish these is said to have a visual acuity of 20/200, that is he can only see at 20 feet what should be visible at 200."

In the instant case, however, we deem the parties to have made the law of the case by taking, without exception, the trial judge's oral charge.

So considered we nevertheless think there was enough conflict in the evidence to require the court below to give the case to the jury and (under Cobb v. Malone, 92 Ala. 630, 9 So. 738) to refuse the motion for a new trial.

The judgment of the circuit court is

Affirmed.