**CENTRAL MAINE POWER COMPANY, and Hartford Steam Boiler Inspection & Insurance Company, Plaintiffs,**

**v.**

**FOSTER WHEELER CORPORATION and Burns & Roe, Inc., Defendants.**

**Civ. No. 83–0056–P.**

United States District Court, D. Maine.

April 15, 1988.

Memorandum of Decision and Order April 18, 1988.

---

Jotham D. Pierce, Jr., Pierce, Atwood, Scribner, Elizabeth T. McCandless, and Scott T. Maker, Norman and Hansen, Portland, Me., James D. Poliquin, for plaintiffs.

F. Timothy McNamara, Hartford, Conn., for Hartford Steam Boiler.

Elizabeth G. Stouder, Harrison L. Richardson, Portland, Me., and James A. McCormack, for Burns and Roe.

Phillip D. Buckley, Rudman & Winthell, Bangor, Me., Norman D. Alvy, Buckley, Treacy, Schaffel, Mackey & Abbate, New York City, Eugene Schaffel, for Foster Wheeler.

FINDINGS OF FACT AND OPINION, AT THE CONCLUSION OF ALL OF THE EVIDENCE, ON THE RENEWED DEFENSE MOTIONS FOR INVOLUNTARY DISMISSAL OF COUNT II OF PLAINTIFFS' AMENDED COMPLAINT, PURSUANT TO Fed.R.Civ. P. 41(b)

GENE CARTER, District Judge.

## I. PROCEDURE

Trial in this matter commenced on June 15, 1987, with the presentation of Plaintiffs' case-in-chief. At the conclusion of the Plaintiffs' case, Defendants made oral motions, which were heard on the record by the Court, for involuntary dismissal of the claims asserted by Plaintiffs pursuant to Counts I and II of Plaintiffs' Amended Complaint. On June 26, 1987, the Court

entered its Order on Motion for Involuntary Dismissal denying the motions. The trial proceeded thereafter with the presentation of evidence by both Defendants. Following the conclusion of all of the evidence, Defendants renewed their motions for involuntary dismissal of Count II of the Plaintiffs' Amended Complaint. The Court took the motions under advisement. After conferring with counsel, the Court entered its Procedural Order of July 15, 1987, requiring the parties to file principal and reply briefs on the motion on or before July 24, 1987. The Court indicated that it would decide the motion "no later than during the week of August 3, 1987." In the meantime, the Court had prescribed a schedule for the filing of briefs and proposed findings of fact with respect to the merits of the issues generated by Count I of Plaintiffs' Amended Complaint.

The Court entered its Order on Defendants' Motion for Involuntary Dismissal Pursuant to Fed.R.Civ.P. 41(b) on August 7, 1987, granting the Defendants' motions for involuntary dismissal of Count II of Plaintiffs' Amended Complaint. The order indicated that the Court's findings of fact and opinion would follow in due course. The Court herewith renders its findings of fact and opinion.

The applicable standard of factual review on a motion pursuant to Rule 41(b) is fully set out in this Court's Memorandum of Decision on the Motions for Involuntary Dismissal Rendered at the Conclusion of the Plaintiffs' Case-in-Chief. *Central Maine Power Co. v. Foster Wheeler Corp.,* 116 F.R.D. 339 (D.Me.1987). All of the evidence on liability issues having now been heard and being the subject of extensive briefing, the Court will herein exercise its discretionary authority to weigh and evaluate the evidence as it bears upon the issues generated by these motions and render findings of fact on the evidence for purposes of resolving issues generated by the Count II claims. *D.P. Apparel Corp. v. Roadway Exp., Inc.,* 736 F.2d 1 (1st Cir.1984). Under the law of this circuit, it is clear that such a motion may not be granted unless "it is manifestly clear" that the plaintiff cannot recover on the evidence. *Id.*

## II. COUNT II (BREACH OF WARRANTY)

Count II of the Amended Complaint (Docket Item # 23) sets forth that Defendant Foster Wheeler "warranted explicitly and implicitly that the condenser was reasonably suitable for the ordinary purposes for which condensers are used and that it was suitable for the particular use to which Central Maine intended to put the condenser." Amended Complaint, ¶ 12. Further allegation is made that Foster Wheeler knew of the particular purpose for which the condenser would be used and that the Plaintiff would rely on the skill and judgment of Foster Wheeler in furnishing a suitable condenser. Recovery is sought on the basis of an alleged breach of these warranties. *Id.* at ¶ 13. Foster Wheeler has pleaded, *inter alia,* as an affirmative defense:

AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE, by the terms of the July 17, 1974 Agreement between Plaintiff and Defendant, Foster Wheeler, alleged in Paragraph 6 of the Amended Complaint, Foster Wheeler's exclusive liability to Central Maine Power Company for any purported defects in the equipment furnished are set forth in the warranty provision of said Purchase Order Agreement, the terms of which have been fully complied with by Foster Wheeler and the time period set forth under said warranty provision has expired and, thus, the Amended Complaint herein fails to state a cause of action against Foster Wheeler.

It is also alleged in the Amended Complaint that Foster Wheeler agreed to design, furnish and erect a condenser and certain accessory equipment for CMP's Wyman # 4 unit. *Id.* at ¶ 6. The parties have agreed that Plaintiffs seek to recover for a defect in design constituting either negligence in design (Count I) of the condenser or a breach of express or implied warranties (Count II) and that no claim is made for defects in materials or workman-

ship in either the fabrication or erection of the condenser by Foster Wheeler.

Plaintiff's proof establishes, and the Court finds, that Plaintiff Central Maine Power Company was the owner of Wyman Substation at which the Wyman # 4 unit was to be erected. It retained the Third–Party Defendant, Burns & Roe, Inc., to act as consulting engineer on the Wyman # 4 project and to do the design work for the entire unit, which consisted generally of a boiler unit, a turbine unit, and other related systems in addition to the condenser unit. Part of Burns & Roe's contract commitment was to provide specifications for all systems within the Wyman # 4 unit and to oversee the bidding and construction process as a consulting engineer on behalf of the owner, Central Maine Power Company. (Foster Wheeler Exhibit 2 at 3–6.)

Pursuant to its undertaking, Burns & Roe issued an Invitation to Bid, Specifications and Bidding Documents for "furnishing of all labor, plant, tools, materials and equipment, erection supervision and erection labor as required for the Condensers" dated August 1973 (Plaintiff's Exhibit 1 at ITB–1). Copies of the Specifications and Bidding Documents were provided to qualified bidders, including Defendant Foster Wheeler Corporation. The Invitation proposed that bidders, in their proposals, provide for furnishing all equipment, materials, labor, and testing required to complete the contract requirements "as set forth in the general and detailed specifications attached hereto." (Plaintiff's Exhibit 1 at ITB–3.) The invitation to bid provided, however, for those submitting bids to take exceptions to the contract documents. The Invitation stated:

> [a]ny and all exceptions taken by the Bidder to any of, or any part of, the Bidding Documents shall be listed individually and numbered in Bidding Schedule "Exceptions to Bidding Documents["]. Any exception deemed by the Engineer to be of a major nature will constitute grounds for rejection of the Bid.

Plaintiff's Exhibit 1 at ITB–7. The invitation to bid further provides that "any change from specified scope of supply, either in the form of substitution or as an omission, shall be listed as an exception." *Id.*

Schedule C of the bidding schedules, prepared by Burns and Roe as part of the contract documents, set forth the following warranty:

> [i]n addition to any guarantees specified elsewhere or provided by law, we warrant that all materials and equipment furnished and all work performed hereunder shall be of specified quality, free from faults or defects, free from faulty design (except to the extent said design is furnished by Owner) and of sufficient size and capability and of proper material so as to meet in all respects the requirements of the Contract Documents and the operating conditions specified.

Plaintiff's Exhibit 1 at BS–2. Foster Wheeler transmitted, under cover of its letter of December 14, 1973, a proposal and specification for the condenser dated December 7, 1973 (Plaintiff's Exhibit 2). The proposal included a Schedule E, taking exception to the Schedule C warranty, as permitted by the invitation to bid. That exception provided, *inter alia*, that the above-referenced warranty paragraph of Schedule C of the bidding schedules should be deleted and that alternative warranty language should be inserted in its place. The warranty proposed by Foster Wheeler was in two parts, the first of which related to material and workmanship. The second part, relating to *performance*, states:

> B. PERFORMANCE. The Corporation warrants that the equipment to be delivered by it shall perform in accordance with the conditions of performance specified on the Corporation's Data Sheets included in the proposal.
>
> The Corporation's total responsibility under this performance warranty shall be considered fulfilled and the equipment accepted if the performance tests show that the equipment meets the specified conditions of performance or if the equipment is not tested within two (2) years after shipment. In the event the equipment fails to meet the specified condi-

tions of performance after properly conducted and evaluated tests, the Corporation reserves the right to make such alterations, or furnish such additional equipment as may be necessary to meet the original specified conditions, ... free of cost to the Purchaser except that work performed at the Purchaser's plant shall be subject to the same conditions as described above for in-place repairs.

Plaintiff's Exhibit 2, "Schedule E" at 1–2. There follows a disclaimer of all other warranties in the following language:

C. GENERAL. THE FOREGOING WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, EXCEPT THAT OF TITLE, WHETHER WRITTEN, ORAL, OR IMPLIED, IN FACT OR IN LAW (INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR THE PURPOSE).

Correction of nonconformities, in the manner provided above, shall constitute the entire liability of the Corporation, with respect to such equipment, unless otherwise expressly provided [for] in this contract.

*Id.* at 2.

Foster Wheeler later sent its letter of January 22, 1974 to Burns & Roe, which stated: "As a result of our recent discussions with your engineers, we wish to confirm the information given." Plaintiff's Exhibit 3 at 1. There followed a listing in nine paragraphs of clarifications of, or additions to, the terms of the Foster Wheeler proposal. Paragraph 9 states:

To clarify our *warranty* and terms of payment, we offer the following:

(a) Based on your required delivery of August, 1975, we will warranty this

equipment for one year after initial operation but not later than 3/1/78.

*Id.* at 2 (emphasis added).

■ Plaintiff Central Maine Power issued under date of July 17, 1974 its purchase order to Foster Wheeler to furnish, deliver, and unload the condenser for the Wyman # 4 unit and to complete erection of all material included therein.[1] Plaintiff's Exhibit 11. The purchase order stated that it was issued "all per purchase order attachment No. 53025 dated June 28, 1974." The purchase order attachment indicated (Plaintiff's Exhibit 10) contains no substantive language relating to the matter of warranties and states that it is issued:

[a]ll per Burns and Roe, Inc., Specification and Bidding Document No. S–2973–10; Burns and Roe, Inc., General and Special Conditions; Burns and Roe "letter of notification" dated February 28, 1974; Foster Wheeler Corporation proposal for material 0–4–87829 dated December 7, 1973; and Foster Wheeler Corporation proposal 0–4–87829E for erection dated January 25, 1974 *and subsequent letters dated January 22,* January 28, February 5, February 12, and February 15, 1974.

Plaintiff's Exhibit 10 at 5 (emphasis added). Thus, the purchase order specifically incorporated Foster Wheeler's letter of January 22, 1974 (Plaintiff's Exhibit 3) imposing upon Foster Wheeler's performance warranty a temporal limitation of "not later than 3/1/78." Plaintiff's Exhibit 3 thereby became part of the contract between Central Maine Power Company and Foster Wheeler. As of the contract date, it governed the duration of the Foster Wheeler performance warranty.

---

**1.** The erection contract was a separate transaction resulting from Foster Wheeler's erection proposal. Although the invitation to bid asked for bids on furnishing and erection of the condenser, Plaintiff's Exhibit 4 is a separate proposal by Foster Wheeler for erection. Plaintiff's letter and purchase order with attachment, Plaintiff's Exhibits 9, 10, and 11, dealt with both furnishing of the condenser and erection, but accepted them and listed them as separate items, A1 and B1. That they were intended to be the subject of separate contracts is also reflected by Foster Wheeler's response to the purchase order, Plaintiff's Exhibit 12, which accepts the order subject to the understanding that "[t]he unloading and haulage contained in Item A1 is considered part of the erection and should be included in Item B1." Although other purchase order revisions were undertaken, the record does not indicate that that reapportionment was ever rejected by Plaintiff.

The general conditions of the contract documents have a specific provision regarding changes in the contract documents:

> 3.0 *CHANGES, CHANGE ORDERS*— Owner reserves the right to modify Contract Documents by issuance of binding Change Orders concerning changes in the specifications, drawings, contract provisions, schedules or other conditions or provisions.
>
> The Change Order shall take effect upon acceptance by Contractor. No change, alteration, or modification of Contract Documents shall be made except by Change Order.

Plaintiff's Exhibit 1 at GC–7.

Counsel have not pointed the Court to, and the Court has not found from examination of all of the documentary exhibits admitted in evidence in this case, any change order or any other modification of the contract provision limiting the duration of Foster Wheeler's performance warranty to March 1, 1978.

It is undisputed, and all the evidence reflects, that the failure of the condenser tubes giving rise to this litigation and the claims of the Plaintiff against Foster Wheeler occurred on January 15 and January 16, 1979.

■ Plaintiff contends that the contract between CMP and Foster Wheeler contains express warranties pertaining to the spacing of support plates in the condenser as it relates to tube vibration.[2] The Court agrees that the representations, made by Foster Wheeler in its proposal and cited below, do indeed constitute express warranties, 11 M.R.S.A. § 2–313;[3] *Cutherbertson v. Clark Equipment Co.*, 448 A.2d 315, 320 (Me.1982), for they became part of the bargain between the parties.

■ Plaintiff also contends that these express warranties are *"in addition to"* any warranties set forth in Schedule C as modified by Foster Wheeler." Post Trial Brief of Plaintiffs ... on Warranty Issues, at 2, and are therefore not subject to the limitations and disclaimer imposed in the specific warranty section of the contract. The Court cannot agree. The performance warranty[4] as set forth in Schedule E, modifying Schedule C warranties, guarantees performance "in accordance with the conditions of performance specified on the Corporation's Data Sheets included in the proposal." The Technical Data Sheets provided as part of Foster Wheeler's bid set forth only the thickness and number of the support plates, Schedule G, B5–6, and do not speak to the performance of the support plates at all. For these data to have any significance as performance criteria they must clearly incorporate the technical specifications regarding support plates that were provided by Burns and Roe in Plaintiff's Exhibit 1. Burns and Roe's technical specifications regarding support plates, to which the Foster Wheeler technical data on support plates correspond, state: "Support plates shall be spaced to prevent harmonic vibration. Space between plates shall not exceed 40 inches on center." Plaintiff's Exhibit 1, at TS–7. The specification and bidding documents stated that "[b]ids shall be submitted in accordance with these specifications and their instructions herein." Plaintiff's Exhibit 1, at IT B–3. Foster Wheeler did not take exception to that portion of the technical specifications, Plaintiff's Exhibit 2, Schedule E, and the Court regards it as incorporated by necessity in the Technical Data Sheets of Foster Wheeler. Since the Performance Warranty in-

---

**2.** Specifically, Plaintiff asserts that Foster Wheeler warranted that "support plates shall be ... located so as to preclude the effect from harmful vibration," Plaintiff's Exhibit 2, ¶ 7; that the support plates were "of sufficient number to eliminate tube vibration induced by resonant frequencies and high velocity steam passing the tubes." Plaintiff's Exhibit 2, at 11.

**3.** The Court's review of all the contract documents, and in particular Foster Wheeler's December 14, 1973 letter transmitting its proposal,

Plaintiff's Exhibit 2, and CMP's purchase order incorporating its purchase order attachment, Plaintiff's Exhibits 11 and 10, indicates that the contract for the condenser is primarily a contract for the sale of goods. As such, it is governed by the Uniform Commercial Code (the Code) found in 11 M.R.S.A. § 1–101, *et seq.*

**4.** As noted previously, Schedule E contained two warranties, one for Material and Workmanship, the other for Performance. It is the latter with which these warranty claims deal.

cludes by necessary implication a warranty concerning harmonic tube vibration not limited to any particular cause, the similar warranties in Foster Wheeler's proposal to which Plaintiff points are not in addition to the express warranty set forth in Schedule E, but merely duplicative of it.[5]

Since all the express warranties are contained in Schedule E, they are ostensibly subject to the temporal limitations found there. Section 2–316 of the Uniform Commercial Code provides that

> [w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed whenever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

11 M.R.S.A. § 2–316.[6] The Court does not find the temporal limitation of the performance warranty to be inconsistent with the express warranty. The limitation does not purport to remove performance problems from warranty coverage entirely. Rather, it allocates the risk, on the basis of the time of discovery of a performance failure. *See AES Technology Systems, Inc. v. Coherent Radiation,* 583 F.2d 933, 939 (7th Cir.1978).

■ There is no reason that an express warranty must be absolute and unqualifiable. The parties, particularly sophisticated ones such as these, should be free to agree on whatever warranty terms they desire as long as they are not inconsistent. *See Standard Alliance Industries v. Black Clawson Co.,* 587 F.2d 813, 820 (6th Cir.

1978); *see also* J. White and R. Summers, Uniform Commercial Code, at 431 n. 19. Comment 1 to section 2–316 makes clear that subsection 1, quoted above, was designed to protect a buyer from "unexpected" and "unbargained" language, a situation which does not arise in cases like this one where the limitation language was fully bargained.[7]

Plaintiff raises specific challenges to the effectiveness of the temporal limitation, which the Court will address in turn. First, Plaintiff asserts that the March 1, 1978 expiration date in the Schedule E warranty section does not prevent recovery on the specific warranties because the defect and breach upon which the action is premised occurred before the expiration date even though the damages did not occur until after it.

The Court notes that of the two warranties agreed upon in Schedule E, only the performance warranty is in issue. The parties have agreed that the failure of the condenser did not occur because of defects in materials or workmanship. Memorandum of Decision on Defense Motions for Involuntary Dismissal Pursuant to Fed.R. Civ.P. 41(b), 116 F.R.D. at 341 n. 1 (D.Me. 1987). Rather, the claim is that a defect in design caused a failure of performance. In the contract warranty structure, the only place where a possible design defect might be covered is in the performance warranty, presumably because design is intimately related to performance. The warranty is not against defects in design, however, but against failure of performance.

■ A breach of the performance warranty is established only by failure of the equipment to perform as required. Cre-

---

**5.** *Community Television Services v. Dresser Industries,* 586 F.2d 637 (8th Cir.1978), on which Plaintiff relies, is inapposite because in that case the express warranty found in an advertising brochure made an affirmation about the product distinct from that found in the warranty clause and the time limitations in the warranty clause were found not to apply to the warranty made outside the warranty clause. Here, of course, the express warranties which Plaintiff seeks to assert are the same as that found in the warranty clause.

**6.** The Court is aware that section 2–316 questions usually arise when the express warranties are found outside the warranty clause. *See* J. White & R. Summers, Uniform Commercial Code, at 432 (1980).

**7.** The bargaining is reflected in the fact that the limitation language was proposed by Foster Wheeler as an exception to the unlimited warranty suggested by Burns and Roe and accepted by CMP, with an expanded limitation period, after discussion and receipt of a letter from Foster Wheeler setting forth the new terms.

ation or existence of a defect prior to the failure of performance is not such a breach. Under the terms of Schedule E, as modified by Foster Wheeler's letter of January 22, 1974, for recovery to be available under the performance warranty, breach had to occur while the warranty was in effect; that is, before March 1, 1978. Thus, Plaintiff's assertion that a defect was created before the warranty expired is irrelevant to determination of whether recovery is available for breach of the performance warranty. What is crucial is the time of failure of performance, for the parties have allocated the risk of failure of performance such that it will be borne by Foster Wheeler until "one year after initial operation but not later than 3/1/78" and by CMP after March 1, 1978. Plaintiff cites an Alaska case similar to this one where the court explained this critical point:

> When a warranty extends to future performance, the cause of action accrues on the day the defect is or should have been discovered, *provided this day is within the warranty period....* Here the parties agreed that the warranty would expire in February, 1978, and the defect did not make its presence known until the time of the generator failure, nearly a year after the warranty had expired. *Since no defect arose within the warranty period, no breach of warranty action can be maintained.*

*Kodiak Electric Association, Inc. v. Delaval Turbine, Inc.,* 694 P.2d 150 (Alaska 1984) (emphasis added). *See also Standard Alliance Industries v. Black Clawson Co.,* 587 F.2d at 821. The failure of the condenser to perform, the only issue here, occurred on January 15–16, 1979, far outside the warranty period.

Plaintiff argues in the alternative that the Foster Wheeler warranties did not expire before January 15–16, 1979 because paragraph 9.2 of the Special Conditions of the contract documents states that CMP may operate the equipment for ten days at rated capacity before it is deemed accepted for commercial operation. When this paragraph is read in conjunction with the express warranty concerning vibration, Plaintiff argues, a warranty extending beyond March 1, 1978 is created. Plaintiff's argument suffers from severe foundational defects.

First, although Plaintiff contends that the two provisions read together are entirely independent from the modified Schedule C warranties, the Court's previous discussion has made clear that that is not the case and that the express warranties concerning vibration are subsumed in modified Schedule C and therefore subject to its limitations. Plaintiff argues, however, that the express warranties concerning vibration, when read together with paragraph 9.2 of the Special Conditions, create a warranty that conflicts with the limitation in modified Schedule C. Plaintiff relies on 11 M.R.S.A. § 2–316 for the proposition that the warranty limitation found in Schedule E must give way to other warranty language inconsistent with it.

Even if there were an express warranty existing outside the warranty provisions, the language in paragraph 9.2 is not part of any such express warranty. It describes a procedure for acceptance of the condenser and is not an affirmation about the equipment or even about liability. It is, quite simply, not express warranty language in any sense under 11 M.R.S.A. § 2–313. As stated previously, section 2–316 is designed to protect buyers from unbargained and unexpected limitation or disclaimer language; it is not meant to eliminate bargained limitation language in favor of nonwarranty language in another part of the contract dealing with a different topic; in this case, mode of acceptance.[8] That section 9.2 was not intended to create

---

**8.** Although Plaintiff is not entitled to rely on nonwarranty, procedural language as establishing temporal requirements for the warranties, and Defendant was entitled to bargain for and receive a limitation on liability if for some reason testing did not proceed as expected, there was a means of protection for Plaintiff within the framework bargained for by the parties. As the date of the bargained warranty expiration approached, Plaintiff could have initiated a change order to extend the expiration date and allow for the desired testing. It did not do so, however.

a warranty is reinforced by the fact that the Schedule E modification of section 9.2 specifically refers to the contract warranty.[9]

Plaintiff further argues that the March 1, 1978 warranty termination date is not controlling because subsequent to its promulgation in the January 22, 1974 letter, Foster Wheeler incorporated the terms and conditions of the steam generator contract into the condenser contract. The terms of the steam generator contract are not in evidence, and Plaintiff argues that Foster Wheeler should not be able to rely on contractual defenses until all contract documents are in evidence. This argument must fail because the steam generator contract was incorporated into the erection contract, *see* Plaintiff's Exhibit 4, which the Court has found is a separate contract. *See* n. 2, *supra*. It is the warranties of the condenser contract which control here and they are fully before the Court.

Plaintiff bases another argument for vitiation of the warranty expiration term on an alleged mutual expectation of the parties at the time of contracting that the warranty would be in place when the plant was tested at full power. Perhaps both parties did expect that the most likely scenario was that startup would occur before the warranty expired. There was little or no evidence offered on this point, however, and that expectation, if it existed, was not exclusively embodied in the contract. The contract documents are unambiguous, and there is *no* plausible construction of them that permits a finding that the parties' intention was that the warranty would extend at least until after startup. Both Schedule E and the letter of January 22 set two possible dates for the warranty expiration, one keyed to initial operation or performance tests and the other an independent outside limit. Through negotiation, the parties extended the outside limit set forth in Schedule E ("two years from shipment") which would have been roughly

August 1, 1977, to "no later than March 1, 1978." Perhaps this was done because of changed or clarified expectations concerning an anticipated startup date and to further protect Plaintiff in the event of a delayed startup. The reason is immaterial, however, because the documents are clear that the parties agreed that there was a point at which Foster Wheeler's liability for the equipment would end and any risk would be transferred to CMP. That the absolute expiration date was meant to apply even if startup and performance testing had not occurred is readily apparent by reference to the Schedule E warranty, which was clarified by the letter. Schedule E provides that the performance warranty is fulfilled "if the performance tests show that the equipment meets the specified conditions of performance or *if the equipment is not tested* within two (2) years after shipment." Plaintiff's Exhibit 2, Schedule E (emphasis added). The "but not later than March 1, 1978" language in the January 22 clarification also plainly refers to the possibility of the equipment not being tested.

Plaintiff's final argument is that Foster Wheeler's prior knowledge that the support plate spacing was excessive estops it from relying on the warranty expiration date. In *Pino v. Maplewood Packing Co.*, 375 A.2d 534 (Me.1977), a case relied upon by Plaintiff, the Law Court reiterated the foundational principle of estoppel *in pais* as follows:

> if ... [one] actually misleads ... [another] by his own representations, though innocently, the maxim is justly applied to him, that where one of two innocent persons must suffer, he shall suffer, who, by his own acts, occasioned the confidence and the loss.

*Id.* at 539 (quoting *Colby v. Norton*, 19 Me. 412, 418 (1841).

The alleged misleading conduct of Foster Wheeler in this case is its represen-

---

**9.** Schedule E specifically modifies page SC–6, Art. 9.2 Acceptance for Commercial Operation, as follows: "In the last paragraph modify the last three lines to read, 'to a state of Initial Operation and the fault or faults shall be remed-

ied *in accordance with the Contract Warranty.'*" (Emphasis added.) This language demonstrates that the Contract Warranty was intended as the source of Foster Wheeler's obligation under the contract.

tation in the contract documents that the support plate spacing was adequate to prevent harmonic vibration of the tubes. The economic loss to Plaintiff was caused by the expiration of the contract warranty by its terms. It was not in a legal sense caused by failure of the condenser due to harmful vibration, for had the warranty been in effect at the time performance of the condenser was determined, barring other viable defenses, Plaintiff would have had a full contractual remedy for breach of the performance warranty. The loss to the Plaintiff, the expiration of the warranty, was not occasioned, nor did it result in any sense from any misrepresentation Foster Wheeler may have made concerning harmonic vibration, and the record is devoid of any evidence of representation, false or otherwise, by Foster Wheeler that its warranty expiration date would not be operative. Since the estoppel can only be applied when there exists a causal link between the alleged misrepresentation and the loss incurred, the doctrine is inappropriately asserted here. *Id.* at 539 and n. 3.[10]

Further, as previously pointed out, the loss of the warranty was proximately caused by CMP's own conduct in failing to initiate the clearly articulated change-order procedure provided for in the contract documents when it became apparent that the full load operation and performance testing could not be undertaken before the specified warranty expiration date. For this reason, the cause of the event which results in CMP's loss of the benefit of its performance warranty as set out in Schedule C was CMP's own faulty action in not initiating the change-order procedure to extend that date, not any conduct or misrepresentation whatever by Foster Wheeler. In such circumstances, an equitable estop-

pel *in pais* against assertion of the defense of warranty expiration does not operate.

The Court has dealt with the arguments raised by Plaintiff in its memorandum. Although there were allegations in the complaint concerning breach of implied warranties, Plaintiff has not pressed them. It is clear that these cannot be the bases for any claim because Schedule E effectively disclaims all implied warranties. *See* 11 M.R.S.A. § 2–316 and accompanying comments; *see also Lincoln Pulp & Paper Co. v. Dravo Corp.,* 445 F.Supp. 507 (D.Me. 1977).

Accordingly, as previously ordered, Defendant's motion for involuntary dismissal of the warranty claims of Count II of the Amended Complaint under Fed.R.Civ.P. 41(b) is GRANTED.

So ORDERED.

## MEMORANDUM OF DECISION AND ORDER

### I.

■ This case arose out of the failure of a condenser[1] at the Wyman IV Power Station during the evening and early morning of January 15–16, 1979. Plaintiffs Central Maine Power Company ("CMP") and Hartford Steam Boiler Inspection & Insurance Company[2] ("Hartford") have brought suit against the condenser's manufacturer, Foster Wheeler Corporation ("Foster Wheeler"). Foster Wheeler, in turn, is seeking contribution from Third–Party Defendant Burns & Roe, Inc. ("BRI"), the project engineer for the Wyman IV Power Station. The liability and damages aspects of this case were bifurcated, and the liabili-

---

10. The Court notes that in *Tracy v. Standard Accident Insurance Co.,* 119 Me. 131, 109 A. 490 (1920), a case relied upon by Plaintiffs, the causal link was plainly present. Defendant insurance company was estopped to deny that notice under an insurance policy was timely. Although the notice given was inadequate, it had been provided on a form erroneously supplied by the company. Plaintiff had reasonably relied on the form as being the correct means of providing notice of his claim.

1. A condenser turns steam back into water in preparation for recycling it for a second pass through a power generating system.

2. Hartford was CMP's insurer for damage occurring at the Wyman IV plant and has subrogation rights in the present action.

ty issues were tried before the Court beginning on June 15, 1987. In analyzing the negligence claims,[3] the Court will examine (1) the Plaintiffs' contention that Foster Wheeler negligently designed the condenser that it sold to CMP; (2) Plaintiffs' claim that Foster Wheeler negligently failed to warn CMP of defects in the design; and (3) the comparative fault of the parties.[4] The following are the salient facts as found by the Court.

## II.

The Wyman IV Power Plant generates electricity by large turbines turned with high pressure steam. After exiting the turbines, the steam is channeled into a condenser which, by creating a high vacuum, turns the steam back into water condensate which can then be recycled through the system and eventually converted to steam again for a new pass through the turbine.

The condenser includes many tubes full of circulating salt water which help cool the steam as part of the process of converting it back into water condensate. These tubes must be shielded from harmful vibration to prevent them from being damaged, and they are protected at regular intervals by support plates which dampen the vibrations caused by the passage of steam over them. These plates form the structural members of the tube bundle of the condenser and, when present in sufficient number, they lessen tube deflection and reduce the possibility of tube breakdown.

The Wyman IV Power Station was brand new in January of 1979 and was in the process of its first twenty-four-hour run at full power when the incident in question occurred. For reasons that will be elaborated below, the Court finds that at approximately eight o'clock on the evening of January 15th, leaks developed in several of the titanium tubes that carry salt water

3. At the conclusion of all of the evidence at trial, the Defendants renewed their prior motion for involuntary dismissal of Count II of the Plaintiffs' Amended Complaint, in which are asserted the Plaintiffs' claims based upon alleged breach of warranties. After conferring with counsel, the Court entered its Procedural Order of July 15, 1987, requiring the parties to file principal and reply briefs on that motion on or before July 24, 1987. The Court indicated that it would decide the motion "no later than during the week of August 3, 1987." The Court entered its Order on Defendants' Motion for Involuntary Dismissal Pursuant to Fed.R.Civ.P. 41(b) on August 7, 1987, granting the Defendants' motion for involuntary dismissal of Count II of the Plaintiffs' Amended Complaint. The Order indicated that the Court's findings of fact and opinion would follow in due course. The Court has entered, as of April 15, 1988, its Findings of Fact and Opinion reporting the action taken by the Order of August 7, 1987 in respect to the Count II claims.

4. Defendants assert the affirmative defense of collateral estoppel in this action, seeking to prevent relitigation of certain findings made by the Maine Public Utilities Commission (PUC) in a decision issued on October 30, 1981. In a rate change request, CMP had sought to include in its rate base the capital costs incurred to repair the damage caused by the salt water incursion at the Wyman IV Power Station. The PUC disallowed the request, finding that CMP's management and operations at the time the contamination occurred was imprudent.

Section 27 of the Restatement (Second) of Judgments, adopted by the Maine Supreme Judicial Court, *Sevigny v. Home Builders Ass'n, Inc.*, 429 A.2d 197, 202–02 (Me.1981), provides that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." This principle generally applies to adjudicative determinations by an administrative tribunal like the PUC as well. *See* Restatement (Second) of Judgments § 83 (1982).

Although the PUC's finding of "imprudent management" was apparently essential to its determination and the PUC's decision might, therefore, be entitled to the same conclusive effect as a judgment of a court, the Court finds that such treatment is unwarranted here and that CMP should not be precluded from litigating the comparative negligence issue.

The Court is not satisfied that CMP had a full and fair opportunity to litigate before the state administrative body the issues concerning possible negligence in its conduct. The substantial difference in the nature of the proceedings leads the Court to the conclusion that although some of the same words were used that might be used in discussing negligence in this Court, the issue was neither litigated nor decided in the same terms as it has been in this Court. *See id.,* § 83C; *see also* C. Wright, A. Miller and E. Cooper, 18 *Federal Practice and Procedure* § 4423, at 220–21 (1981); *BBD Transportation Co. v. U.S. Steel Corp.,* 1976–2 CCH Trade Cases ¶ 61, 029 (D.Cal.1976).

through the condenser.[5] High velocity steam in the condenser caused the tubes to vibrate and the vibrations caused them to crack.[6] Small quantities of salt water escaped into the system over the next few hours. At approximately midnight, at least two of the leaking tubes broke altogether and released large quantities of salt water into the freshwater part of a system in which it is of utmost importance that salt and fresh water be kept separate. Salt contamination was carried from the condenser to other units in the power plant, including the plant's feedwater heaters, boiler, and turbines, causing significant damage. CMP personnel overlooked or ignored evidence of salt contamination throughout the evening of January 15th and the morning of January 16th until finally they became aware of very high conductivity readings and a sharp drop in the system load. For the first time the operator deduced there was a serious problem and shut the plant down at approximately eight o'clock a.m. on the 16th.

### III.

Before examining the issue raised concerning defect in design, it is necessary to put to rest Foster Wheeler's contention that it is not responsible for the defect, if any, because it was not responsible for the design of the condenser. BRI, with CMP's participation, had prepared specifications pertinent to the construction of the condenser which is the subject of this litigation, and these specifications were sent to a list of bidders. The request for bids prepared by BRI specified that proposals should include a maximum of forty inches between support plates in the tube bundle.

Foster Wheeler, a firm that had been designing condensers since 1890, was one of five firms to respond to CMP's request for bids for the construction of the Wyman IV Power Plant condenser. In its proposal, Foster Wheeler specifically represented that "support plates shall be ... located so as to preclude any effect from harming vibration," and that support plates would be "of sufficient number to eliminate tube vibration induced by resonant frequencies and high velocity steam passing the tubes." Foster Wheeler's bid, which BRI termed "somewhat more conservative" than those submitted by other bidders, was accepted upon BRI's favorable recommendation and CMP's concurrence.

The spacing between support plates in Foster Wheeler's condenser was indeed forty inches, the maximum permitted in the specifications. As a condenser manufacturer, however, Foster Wheeler had a nondelegable duty to exercise professional competence and reasonable care in all aspects of condenser design. *See Maietta v. International Harvester Co.*, 496 A.2d 286, 297 (Me.1985). *See also* W. Prosser, *The Law of Torts*, at 645 (1971).

Foster Wheeler's duty to space support plates appropriately was not relieved by the inclusion of a maximum allowable distance in the bid specifications. That is particularly the case since Foster Wheeler represented that its support spacing would be tailored to the particular function required rather than to any particular numerical formulation. BRI's specifications were obviously meant to provide guidance in achieving the same functional goal. They explicitly state that "support plates shall be spaced to prevent harmonic vibration." Thus, they set only a maximum boundary and leave the specifics to the successful bidder. Moreover, Foster Wheeler representatives testified that Foster Wheeler did

---

**5.** Foster Wheeler's director of condenser and feedwater engineering, William Bow, testified at his deposition that "on a condenser plant during startup ... [t]here may be tube joint leaks, might be local tube break from a connection or as we ran into here, a local vibration problem," all of which are part of "the normal history." Bow Dep. Tr. at 94. While such leaks might be normal, as will be discussed, these and the consequent rupture of the tubes might have been prevented.

**6.** Foster Wheeler conducted an investigation after the January 15th accident and, in a report dated March 23, 1979, concluded that tube vibration was the most likely cause of the tube failure that occurred the night of the accident. Plaintiff's Ex. 123. It reached its conclusion after conducting macroscopic and microscopic examinations of three sections of the failed tubes. The Court agrees with these conclusions.

not rely on the specifications; rather, it arrived at its spacing proposal after performing its own study and based the spacing of support plates on its own best judgment. The Court finds, therefore, that Foster Wheeler, not BRI, was responsible for the design of the condenser, at least insofar as it is pertinent to this case.

## IV.

Plaintiffs claim that the condenser was negligently designed because the number of support plates was inadequate to prevent vibration. The Maine Law Court has stated that in negligence actions based upon defects in design, "the plaintiff must prove that the product was defectively designed thereby exposing the user to an unreasonable risk of harm.... Such proof will involve an examination of the utility of its design, the risk of the design and the feasibility of safer alternatives." *Stanley v. Schiavi Mobile Homes, Inc.*, 462 A.2d 1144 (Me.1983).

The testimony showed that Foster Wheeler relied on guidelines for support plate placement formulated by Dr. Joseph Lichtenstein and published in his 1946 paper, "Tube Vibration and Number of Support Plates." Ex. 103. Foster Wheeler's witness Bow acknowledged that at the time he wrote the paper, Lichtenstein was under the false impression that high velocity steam would not cause tubes to vibrate. Bow testified that the Lichtenstein formulas for tube support placement were derived without considering the impact of high velocity steam on the tubes and were

not intended to provide guidelines for placing tube supports so as to guard against steam-related vibration. He further testified that Foster Wheeler relied exclusively on the Lichtenstein formula in designing the Wyman IV condenser. It ran no separate analysis to take into consideration the impact of high velocity steam on the tubes, despite the fact that formulas existed both for determining the velocity of steam in a particular condenser and for determining the velocity at which such steam would induce harmful vibration. Bow testified at his deposition[7] that the reason Foster Wheeler was comfortable in relying solely on the Lichtenstein guidelines was because Foster Wheeler had had "virtually no problems" with the approximately one hundred condensers it had built per year since adopting the Lichtenstein formula. Ex. 100, Bow Dep. Tr. at 66–67; Trial Tr., Vol 2, at 337.

Although Foster Wheeler had had few problems with tube vibration prior to designing Wyman IV, condenser breakdown due to an inadequate number of support plates has been an industry problem for many years. According to Mr. Bow, several manufacturers had had severe problems with vibration, causing them to research the issue and write papers which became well known in the industry and which led to the promulgation of recommended industry guidelines for support plate placement. These guidelines were published on January 1, 1978 by the Heat Exchange Institute (HEI), of which Foster Wheeler is a member.[8] Bow testified that

---

7. Certain depositions, like that of Mr. Bow, who was deposed as the corporate designee of Foster Wheeler, were admitted as trial exhibits.

8. Bow testified that the design of the support plates had already been completed at the time that Foster Wheeler submitted its proposal to CMP in 1974, nearly four years before the release of the HEI recommended guidelines. However, Bow also testified that Foster Wheeler had numerous representatives to the Heat Exchange Institute and that he was one of them in 1978 and that he was aware of the proposed guidelines from the time of their inception. He testified that he was aware of the discussions taking place within the Institute "many years before this came out probably ... because we knew of the problems that everybody was hav-

ing." Trial Tr., Vol. 2, at 284. Bow said that at the time CMP submitted its purchase order to Foster Wheeler in 1974, he "probably knew that there was work on [the HEI minimum guidelines], ... it was a good direction." *Id.* at 289–90. Bow also stated that he was aware of preliminary discussions on the proposal during the period 1970 to 1975, that the primary source of the guidelines was a paper published in 1962, and that he was aware in the early 1970's that the proposal would call for more tube support plates than were in the Wyman IV condenser. *Id.* at 307.

The Court ruled at trial that the seventh edition of the Heat Exchange Institute standards for steam surface condensers, Exhibit 102, would be admitted over a relevancy objection

Foster Wheeler was "in agreement with modifying standards" and that after January 1, 1978, it conformed its bids and designs to the new HEI standard. Gauged against the standard, the Wyman IV condenser had an inadequate number of support plates. *See* Trial Tr., Vol. 2, at 307.

Bow testified at his deposition that he believed the Wyman IV accident occurred because the tubes were struck with high velocity steam. Bow said that Foster Wheeler was aware that vibration induced by such localized high velocity steam can occur, and that, in fact, such incidents are not uncommon.[9] Bow went on to testify that damage from such high velocity surges can be avoided by closer support plate spacing or by the insertion of slats between the tubes to dampen them and prevent them from vibrating.

There was no testimony at trial that the addition of extra support plates would have interfered with the functioning of the condenser. In fact, the utility of a different design incorporating increased tube support does not appear to be disputed. As Bow stated at the Foster Wheeler deposition: "We are smarter than that. We've tightened up the standards and designed to new standards today and you'll find much closer support plate spacing." Ex. 100, at 82. The greatest utility of the condenser as designed appears to be in its lower price since each additional support plate incurs additional expense, affecting the manufacturer's competitiveness. Mr. Bow himself agreed with Dr. Lichtenstein's assessment, however, that "the consequences of tube vibration are serious enough so that we must play safe." Trial Tr. Vol 2, at 252.

The risks of inadequate tube support were significant and plainly were well known to Foster Wheeler, as evidenced by Bow's testimony concerning the importance of playing it safe. According to Bow, the high steam velocity that caused the failures in the tube bundle was a common cause of problems in the industry and more specifically was anticipated by Foster Wheeler. Ex. 100, at 64–65. In the face of an industry-wide problem, Foster Wheeler's complacence, based on its previous record seems misplaced, especially since the formula for support spacing followed contained clearly erroneous assumptions concerning the effect of high velocity steam. As the Court has found, Foster Wheeler also should have known about the likelihood of dry tubes in the condenser which can precip-

---

only on the limited issue of the duty to warn. Upon further reflection and after reviewing the testimony cited immediately above, the Court concludes that the standards are probative on the issue of whether or not Foster Wheeler acted negligently in designing the condenser it sold to CMP and that Exhibit 102 should be, and is hereby, admitted generally. Bow's testimony clearly indicates that at the time Foster Wheeler submitted a condenser design to CMP with tube support plates placed as far apart as forty inches, he was fully aware that HEI was discussing issuing guidelines under which such placement would be considered inadequate.

9. In asserting the reasonableness and utility of its design, Foster Wheeler contends that its tubes and support structure were built with an extra margin of safety and that tube failure would not have occurred but for the alleged negligence of CMP in allowing the tubes to run dry. Foster Wheeler's former manager of condenser service, Emil Ozimek, offered mathematical computations in support of his theory that given the temperature of the water in the Wyman IV condenser and the amount of back pressure at which the condenser was running, the tubes should not have been damaged unless they were allowed to run dry. Ozimek testified that the tubes are supposed to be kept full of water and that full tubes can withstand the impact of high velocity steam better than dry tubes. Ozimek's theory is supported by the fact that after the accident segments of neoprene, a substance used to line tunnel walls at the Wyman IV plant, were found to have come unstuck and settled in the water boxes through which salt water passes on its way to the condenser tubes. It was hypothesized that this neoprene may have clogged the passageway from the water box to the tubes and allowed some tubes to run dry.

Even if it were to accept Ozimek's theory, the Court must conclude that the presence of dry tubes should have been clearly foreseeable to Foster Wheeler when designing the condenser and that the condenser should have been designed to operate safely with such tubes. The Court heard considerable testimony indicating that the normal method of dealing with a tube leak is to drain the tube and plug it; thereafter the tube is dry or effectively so. Such an evidentiary record compels a finding that dry tubes are a common occurrence in condensers and that condensers are properly to be designed to operate safely with them.

itate tube failure at lower than the maximum velocities expected.

Finally, the alternatives to the condenser design provided by Foster Wheeler are feasible and do not place an excessive burden on Foster Wheeler. This is evidenced by the fact that Foster Wheeler and other members of the condenser industry have routinely used more support plates since January of 1978. Moreover, protective slats have been used to prevent tube damage "probably from the beginning of time as far as condensers are concerned," according to Mr. Bow.

■■■ Given Foster Wheeler's knowledge of the dangers posed by harmful tube vibration, its ability to avoid the damage through increasing the number of tube supports or by placing protective slats between the tubes, its awareness of industry problems and its participation in promulgating stricter guidelines, the Court concludes that Foster Wheeler was negligent in designing a condenser in which tube vibrations resulted in the tube failure in question.

### V.

■■■ Plaintiff has also alleged that Foster Wheeler was negligent because it failed to warn CMP about the potential harm to the condenser that could be caused by high velocity steam. As Plaintiff has acknowledged in its post-trial memorandum, however, "if a manufacturer can eliminate a hazard without excessive cost and without unacceptable interference with product function, the manufacturer has the obligation to design out the hazard rather than simply warn of its existence." Plaintiff's Brief at 21. The Court agrees. In this case, Defendant's negligence consisted of designing a defective condenser. While the record makes clear that Defendant did not warn of the possibility of condenser failure under certain circumstances, its primary obligation was to design the condenser properly, not warn of the existence of the defect. The Court, therefore, will not discuss any further the failure to warn.

### VI.

Under Maine law, which is here applicable, a party may not recover for another's negligence "if such claimant is found ... to be equally at fault." 14 M.R.S.A. § 156. The Court must therefore examine whether actions or omissions by CMP contributed to the damage incurred at Wyman IV and, if so, to what extent.

There is abundant evidence that CMP employees were badly overworked prior to the incident and that CMP supervisors pushed forward despite the lack of readiness of important equipment in order to bring the Wyman IV Power Plant into commercial operation as quickly as possible.[10] Many CMP employees were working twelve-hour shifts on a regular basis, and some were working as much as sixteen consecutive hours.[11] In a November 16, 1978 letter, BRI passed on its "strong recommendation" that numerous tests be performed prior to proceeding with plant startup. It went on to say that "[i]n the rush to 'go commercial' sufficient time was not allowed to perform many of these tests; and it must be remembered that their purpose is to find system operational problems before they actually pop-up during full plant operation." Defendant's Ex. 22. CMP responded on November 20th that "[W]e fully realize that certain preoperational test steps have not been performed" but that "in view of the fact that the time for preoperational testing has slipped from approximately three months to nil we feel that we have no alternative but to start the unit, on a controlled basis, to meet the commitments made to and by CMP Co." Defendant's Ex. 23.

---

10. CMP startup engineer Carlisle Watson testified that "[W]hen any unit is brought on the line by a public utility, you can't recover costs and rate until the unit goes commercial so naturally you want to go commercial as soon as practicable."

11. Donald Knowlton testified that he and other shift supervisors had been working twelve-hour shifts since before November. Engineer Dennis L'Heureux testified that his normal shift was about twelve hours as well. The plant's chemical analysts had been working twelve hours a day since October.

There is substantial additional evidence that Wyman IV was started in haste and prematurely, much of which will be examined in further depth below. Such evidence includes laboratory supervisor James Fraser's January 17, 1979 memorandum indicating that many sample lines leading into Wyman IV's water and steam monitoring panel were inoperable or "jury-rigged" to bring them into operation when the plant was started on January 15, 1979 and the fact that only five of six hundred planned preoperation tests had been conducted on the water and steam panel as of January 29, 1979. Defendant's Ex. 29. Most importantly, the Court also notes that two of the three alarm systems that would have indicated a salt incursion were not in operation on January 15, and that the third one appears to have been misunderstood by key personnel on duty that night.

### VII.

Prior to the accident, it was common knowledge among plant personnel that a salt incursion into the plant's feedwater cycle would cause major damage and that such an incursion was to be avoided at all costs.[12] The plant had a number of different mechanisms by which a salt leak could be discovered at an early stage and protective action taken. One of the primary methods of detecting a salt incursion (as well as a multitude of other potential problems) was through the chemical testing of "grab samples" of steam and water taken from strategic locations around the plant. When a plant has been fully broken in, these samples are taken approximately once a day. However, in a new plant going through the process of being tested and started up, these samples are taken more frequently. During the first two weeks of January 1979, CMP analysts took grab samples approximately every two to four hours on a twenty-four-hour basis. It is undisputed that had these samples been taken during the evening of January 15, the first sample drawn after the salt incursion would have shown evidence of the problem.

The Court finds the record to support the finding that the CMP chemical analysts who were trained to perform grab samples were worked to the point of exhaustion in the months and weeks immediately prior to the time of the incident. CMP technical service supervisor Ronald Pease testified that the chemical analysts had been working twelve-hour duty shifts, one off and one on, since October, that "they were being physically and emotionally drained," and that "they were unfit to continue in that service." Trial Tr. Vol. 3, at 456. On January 15, the only available analyst[13] worked a sixteen-hour shift, reporting at 6:00 a.m. and leaving at 10:00 p.m. Although he took and analyzed some grab samples as late as 9:00 p.m., he took no measurements at several key early warning points after 5:45 p.m. In addition, he himself admits that several of these 5:45 p.m. measurements appear to be incorrect, and that therefore there were no reliable grab samples taken at key points after 12:45 in the afternoon. Trial Tr., Vol. 2, at 368–70. The inadequacy, through understaffing and exhaustion, of the chemical analysis staff reflects poor management planning for the exigencies of bringing to full power operation a new generator of unfamiliar operating characteristics.

This planning failure in turn stems from a more pervasive lack of preparation by CMP management for the start-up. Mr. Pease, a high level supervisor, testified that he was unaware prior to January 15 that unit 4 was going to be started on a twenty-four-hour full-load run on the 15th. He was also unaware of the condition of the polisher, a new device on the Wyman IV generator designed to remove small quantities of contamination from the condensate before it goes back through the

---

12. Equipment attendant Nathan Allen testified: "Salt induction is the worse thing that can happen that was always harped on ever since we first come through the door." [sic] Trial Tr., Vol. 3, at 368.

13. The record indicates that other analysts were on jury duty and out sick.

system.[14] If he had known of either circumstance, he testified that he would have continued taking twenty-four-hour grab samples during the run if he had had rested personnel. Trial Tr., Vol. 3 at 480, 502. On the other hand, start-up engineer Carlyle Watson did not know that the twenty-four-hour grab samples had been discontinued, and Pease testified that "I would assume that had Mr. Watson known that I was just about to remove twenty-four-hour coverage, I would have heard very fast from him." *Id.* at 502.

██ All of this testimony demonstrates to the Court that one segment of CMP's management did not know what another was doing. This miscommunication and the overworked condition of the chemical analysis people, which in turn was the result of the decision to rush to go commercial, led to what can only be regarded as the negligent decision to discontinue grab samples during the first twenty-four-hour full-power run of Wyman IV. From the record in this case, the Court has no doubt that the taking of grab samples at two-hour intervals would have detected the salt leak much sooner and led to prevention of any significant damage.

## VIII.

If all systems had been working properly on the evening of January 15, 1979, CMP's control room operator would have been alerted through three separate sources that a dangerous situation was developing. On January 15, 1979, two of these alarm systems were not operational; the Court finds that the third system did alarm but that its alarm was misunderstood and ignored by CMP personnel.

The polisher, which was viewed as an innovative first line of defense, is equipped with a direct alarm to the control room that goes off when its sensors detect a possible salt incursion. This alarm was not connected during January 15–16, 1979. Samuel Soule, Wyman IV superintendent and the CMP official with overall responsibility for the facility, testified that he was aware that the alarm was not working when he authorized the discontinuation of grab samples on January 15. Trial Tr., Vol. 3 at 84. Clearly, CMP had thought a multiple alarm system was important in detecting and preventing salt incursion. To proceed with operations for the first time at full load knowing that the alarm system was not functioning properly and discontinuing the substitute for the nonfunctioning alarms (the grab samples) was negligent.

The plant also contains a computer system with terminals in the control room that are designed to produce a "redundant" alarm when their sensors detect signs of a possible salt leak. This system was also not operational on January 15. While some CMP personnel knew this, others, including, significantly, the control room operator, *id.* at 169, did not—another instance of serious miscommunication at the management level.

Both of these systems were adjuncts to the plant's primary alarm system, which was designed by BRI with extensive input from CMP. The system included alarms to alert plant personnel to changes in water or steam chemistry that may indicate a salt leak or other potentially dangerous situations.[15] If a change in water or steam chemistry sent one of the alarm system's numerous sensors into an alarm condition, then a signal would be sent to the plant's

---

**14.** On January 15th CMP personnel were unaware that their company had already accepted control of the unit's polisher and that monitoring the polisher was now their responsibility. The polisher was being partially bypassed because of operational difficulties on January 15th and strip chart readings, which show that water coming out of the polisher was as highly conductive as water going in, indicate that the polisher was not performing adequately the night of the accident. Engineer L'Heureux testified that polishers are "very important" and that if

he had known that there was something wrong with them on January 15th, he would not have started the plant up or, if the plant were already generating, he would have taken action to reduce the load.

**15.** The control room alarm that would indicate a problem with water or steam chemistry was one of about six hundred different alarms connected to the various systems throughout the generating plant.

steam and water monitoring panel and to the control room.

This equipment and alarm system were quite new to CMP employees on January 15, 1979. At that time, the water and steam monitoring panel had been operational for less than a week and the entire system was plagued with numerous "nuisance alarms." These alarms occurred when alarm points were set too low, and they were not indicative of any real condition of danger. The Court concludes that these nuisance alarms dulled the sensitivities of CMP personnel to the potential seriousness of a non-nuisance alarm.

This conclusion is supported by CMP's report of its investigation of the accident issued on January 29, 1979. That report stated that "[t]here is a long-standing distrust for this type instrumentation based on a history of high maintenance on unit # 3 on similar devices. No excuse! But it is a very real attitude problem that persists in the minds of operators so they may not take some drops [alarms] as seriously as they should." The report went on to say "[t]he water panel was not fully understood by both Shift Supervisors and Equipment Attendants. Instruments were adequate but the fact that six were out of service and the rest only recently placed in service, left a feeling of distrust in the minds of operators ... [n]uisance alarms deemphasizes [sic] the value paid to drops." Ex. 39.

The trial testimony of Nathan Allen, the equipment attendant on duty during the night of the accident, and Donald Knowlton, the shift supervisor on duty that night, confirms this assessment, suggesting that the presence of alarm lights on the water and steam panel was routinely regarded casually by the very personnel who were entrusted with treating such alarms as a matter of the highest concern.[16] Moreover, Allen and Knowlton both testified that alarm lights were on at the water and steam panel during the night of January 15, satisfying the Court that, despite other testimony to the contrary, an alarm went off in the control room that night.

The system was designed so that any time an alarm went off at the water and steam panel, it would also go off in the control room. Under the standard operating procedure, the control room operator was to push a button indicating that he had heard the alarm, and he was then to send an equipment attendant to the water and steam monitoring panel for additional information. Pushing this button would also turn off the horn and change the alarm light from a bright white to a steady red color. This red light is intended to indicate that an alarm condition still exists, and it cannot be cleared until the problem that originally caused the alarm is solved. Once the alarm condition is resolved, the red light changes to green, a distinct horn sounds to alert the operator that the state of alarm is over, and the operator, by pushing a "reset button," can then turn the green light back to a dimly lit white color, where it will remain until a new alarm comes in. The system was also designed so that as long as a red light is indicating an alarm state due to water chemistry problems, additional water chemistry problems will trigger no further signal in the control room.[17] In other words, as long as any light was red on the water and steam monitoring panel—even as the result of a nuisance alarm—the alarm in the control

---

**16.** Allen testified that there were alarms, such as sodium, that were always blinking and would not reset when he tried to reset them. He did not tell his shift supervisor about the sodium light being on because "I had talked to George Briggs and George Briggs said they were having problems with that particular alarm. I had more or less disregarded it." Trial Tr., Vol. 3, at 357. He also "presumed" that other alarms that were lit on the water and steam panel were not working. *Id.* at 363.

Knowlton testified that he had seen alarms lit on the water and steam panel: "I saw a few lights on the panel, that's about all, nothing flashing." *Id.* at 382. Although he also testified that one could not tell why an alarm had stayed lit, *e.g.,* whether it was measuring a problem or was out of service, he did not go and investigate the lights when he noticed they were lit on the night of the incident. *Id.* at 392.

**17.** New water or steam chemistry problems would trigger additional alarms at the water and steam panel, however.

room indicating trouble at the panel would stay in a red condition. While this light was in a red condition, it would show no sign of *new* trouble at the water and steam sampling panel. CMP participated in choosing this design, and the Court concludes that such a design, while perhaps not optimal, is reasonable as long as plant attendants are instructed that red lights cannot simply be ignored, and as long as backup protection, such as the taking of grab samples, is employed if the plant is experiencing repeated nuisance alarms during its initial performance testing.

Although CMP personnel concluded that the alarm system from the sample panel to the control room worked correctly immediately before and after the accident, Frederick Morse, the CMP control room operator on duty the night of the accident, testified before the PUC that he did not see an alarm from the steam and water sampling panel during his shift that night.[18] Morse's testimony was corroborated by Allen, who said that he did not see an alarm in the control room that night either.

After a careful review of the record, the Court finds that sometime after 4:30 p.m. on January 15th, possibly before Mr. Morse came on duty at 11:30 that evening, and perhaps even before the initial salt incursion at 8:30 p.m., an alarm went off at the water and steam panel and triggered the appropriate alarm in the control room. This may have been one of the "nuisance alarms" that were plaguing the plant during this period or it may have been a signal of real trouble; but in either case, acknowledge buttons were hit by the appropriate personnel, the audible alarms were quieted, and the bright white lights were turned to a steady red.[19]

 The evidentiary record, including CMP's own investigative report of the incident, makes it clear that red lights on alarm panels were treated with extreme nonchalance by CMP personnel in January of 1979. The Court finds it highly likely, therefore, that the initial alarm was dismissed as a nuisance alarm. As the investigative report and trial testimony detailed, no one on the operating staff knew that "once the first instrument is in alarm, no others in that group can alarm" if there is further trouble. Therefore, when Morse and Allen stated that there was no alarm, they were, in all likelihood, referring to a bright white, initial alarm, which could not occur if, as the Court has found, one in the same group of alarms had been previously triggered. Finally, the Court thinks it likely that Morse did not notice the red alarm light because he was relying heavily on his computer to relay to him any alarms that came in. He repeatedly emphasized his reliance on the computer and even at trial he still appeared under the erroneous impression that the computer was equipped on January 15, 1979 to bring him information about an alarm state at the water and steam panel. The record is clear, however, that it was not. Therefore, although the Court finds that one of the alarm systems was functioning on the night of the incident, it was negligently not noticed by the personnel who should have responded to it.

## IX.

 The Court also finds that apart from the discontinuance of the grab samples and the problems with the alarm system, CMP's personnel were negligent in the performance of their monitoring duties, either through lack of adequate training or through simple lack of reasonable diligence. As has been previously noted, at about 8:30 p.m. one or more tubes in the condenser began to leak, and a steady stream of salt water began to enter the system. At about midnight leaking tubes

---

**18.** At trial Morse was far more ambiguous on this point, always qualifying his response with such phrases as, "not to my knowledge," "not to my recollection," "as far as I can recall," and finally, "There's always a possibility that that alarm was in and I didn't see it, there is always a possibility."

**19.** The Court notes that CMP's own investigative report of the incident states that "we have no way to prove that the first drop—Saturated Steam Cation Conductivity—did not go off at about 8:15 p.m. on Jan. 15, 1979." The equipment checked out as being *capable* of alarming, as it should have, at that time.

broke, releasing a torrent of salt water into the system. Finally, just before 1:00 a.m., the level of contamination in the boiler became very high and when the boiler primed it sent salt contamination into the plant's turbines, thereby damaging them.

At the water and steam sampling panel, there are instruments which show the conductivity level of the fluids at various points in the system. Connected to these meters are conductivity strip charts which create an historical record on paper of the conductivity readings at each monitoring point.[20] The Court finds that a properly trained operator or attendant viewing the strip charts or meters after 8:30 p.m. on January 15 would have recognized a dangerous situation that had not yet gotten out of hand but that needed to be addressed to prevent serious damage. Examination after midnight would have suggested to a trained operator or attendant that emergency action was absolutely imperative, since the breaking of the tubes was documented on the strip charts, and thus at the meters, by a sudden increase of more than five fold in water conductivity measurements. Although Nathan Allen, the equipment attendant on duty after 11:00 p.m., testified that he had not been formally trained in monitoring the water and steam panel, the Court finds, from the testimony of Ronald Pease and Samuel Soule that such monitoring was the function of attendants like Mr. Allen as well as other operators.

Mr. Allen had worked as an equipment attendant on CMP's other Wyman power plants since mid–1977, but was still in training for his duties on Wyman IV. Prior to January 15, Allen had always worked with a superior when tending equipment at the Wyman IV plant; on January 15, however, Allen had sole responsibility for the sample area. Allen testified that prior to the accident, he had not attended any classes relating to the water and steam sample panel nor had he received any manuals relating to the panel. He testified that his entire training in interpreting the instrument readings was limited to approximately ten minutes of instruction that he received from George Briggs. Allen testified that as of January 15, he had no idea how to read a strip chart, and had not been told that he was supposed to read them. The Court finds this information particularly significant because CMP supervisory personnel testified that they were relying on Allen to examine strip charts for signs of trouble. Allen's lack of training, which seems to be the product of an oversight or the rush on the part of CMP management to go commercial, resulted in his being unable to detect the problems that were apparent on the instrumentation from 8:30 p.m. on.[21]

Allen testified that he examined the water and steam sample panel meters during an 11:30 tour of the plant and that they appeared normal. From its examination of the empirical evidence provided by the strip charts, however, the Court finds that the meters were reading abnormally high (about twice their normal level) at 11:30 p.m., and that these readings should have been noted and reported. It appears that Allen, with his limited experience and instruction at Wyman IV, did not understand the significance of the readings.[22]

---

**20.** The Court finds to be accurate the times assigned to events by the mechanical strip chart recorders that were monitoring water and steam chemistry throughout the night of January 15th. Although these times were challenged by several CMP employees who contend that the strip charts' chronology does not match their own memories, there has been no evidence presented that the charts malfunctioned or that the times assigned to them were calculated erroneously. The times on the charts were assigned by CMP employees familiar with the recorders, and the Court credits these times as being accurate.

**21.** Although there was testimony that equipment operators in general and Nathan Allen in particular were supposed to have received training and instruction concerning the new equipment, the Court finds no reason to doubt Mr. Allen's account of his actual training and infers that the training of other plant personnel on duty after 8:30 and before Allen came on duty may have been equally slipshod.

**22.** Repeatedly before the PUC and once before this Court, Allen misstated the criteria for determining whether pH and conductivity readings on the meters indicated a salt incursion problem. Although Allen sometimes stated the tests

When at 2:00 a.m. Allen perceived a problem with the readings on the meters and reported it to his shift supervisor, Donald Knowlton, Knowlton, who was nearing the end of his twelve-hour shift, failed to respond with due diligence. After determining from control room operator Morse that there was no alarm indicating trouble at the water and steam panel, Knowlton did nothing further—he did not go to examine the panel himself, he did not call in a chemical analyst to perform grab samples, he did not examine the strip charts, he did not telephone an appropriate superior at home to report the problem, and he did not order the plant shut down. In fact, it was not until approximately 7:30 a.m. (over four hours after Knowlton left) that grab samples revealed that the feedwater chemistry was out of control and the unit was ordered shut down.

Knowlton tried to explain his inaction both before the PUC and at trial. He said that he doubted the accuracy of Allen's readings because "there was a lot of instrumentation on that panel up there that weren't proven." Knowlton said that a few days prior to January 15th he had been told to disregard high readings until he was notified by the lab that the instruments were operational.[23] Knowlton said that he did not look at the strip charts because he did not believe that that was part of his job and because he "very much" distrusted the strip charts because the unit and equipment were new. He did not go to look at the water and steam panel because "my operators are supposed to take care of that." He said he did not order grab samples because L'Heureux told him that a chemical analyst would be coming in at 5:00 a.m. anyway, three hours later, and "I just told [L'Heureux] what was happening, and he made the decisions." Knowlton said that at no time during his shift did he look at the water and steam sampling panel

from a distance of less than fifty to sixty feet away and that although he saw alarm lights on from this distance, he took no action because they were not flashing.

Knowlton's response to the reported serious problem amounts to a serious dereliction of duty when judged by the standards articulated on the record for an appropriate response by his superiors. The Court perceives in his behavior, however, some of the more generalized problems found throughout the plant: a too-casual approach to alarms, due to nuisance alarms; a lack of understanding of the alarm systems; and, perhaps, since he was referred to in CMP documents as one of their better supervisors, a malaise resulting from overwork.

Moreover, although Knowlton's conduct detailed here took place from 2:00 a.m. on and can be regarded, as it was by CMP, as failure of a second line of defense, it indicates to the Court once again that CMP's management practices for the operation of Wyman IV were not well defined, either because of haste or plain sloppiness. Clearly, responsibility for important tasks and decisions slipped through the cracks created by this lack of definition. Time and again, the Court heard testimony that this or that was not done because the actor thought someone else would do it or he did not think it was his job. A clear instance of this was seen when Knowlton testified that he did not order grab samples because L'Heureux was supposed to make the decisions, while L'Heureux testified that he accepted Knowlton's conclusion that the high readings were incorrect "[b]ecause he was the shift supervisor, and they know more about it than I do." Such misunderstandings were far too prevalent at the plant[24] and obviously prevented plant per-

correctly, his misstatements indicate that he may well have been confused on January 15, especially given his limited training.

**23.** The Court heard testimony from Carlisle Watson that the cell replacement that occurred a few days prior to January 15th would only have caused the instrument readings to be unreliable for a period of about one hour while the

cells soaked in, and that a shift supervisor should have known that. After making appropriate credibility judgments, the Court finds that Knowlton was not told to disregard instrument readings until further notice as he testified.

**24.** *See, e.g., supra* at 741 and 744.

sonnel from responding appropriately when problems arose.

### X.

The Court concludes that small leaks in condenser tubes are common and unavoidable. The shearing off of an entire portion of a tube, however, such as occurred at Wyman IV, is unusual and would not have happened but for the negligent acts of Foster Wheeler and CMP. The tubes broke as a result of harmful vibration that could have been avoided by the use of more tube supports or by the placement of protective slats between the tubes. Foster Wheeler's failure to design the condenser with either more supports or with safety slats, given its knowledge of industry problems and its specific representations to CMP, was negligent. However, CMP's failure to discover the presence of tube leaks within the three-and-a-half-hour period prior to the tube's shattering or within the additional fifty minutes to one hour before the boiler primed and sent salt-contaminated steam into the turbine, far exceeded Foster Wheeler's negligence in design.[25]

It is clear to the Court that CMP's decision to run the plant without grab samples at a time when two of its three alarm systems were not functioning properly and the third system was unfamiliar to plant personnel and misunderstood by them constituted significant negligence. In addition, CMP acted negligently in not inspecting its strip charts during the evening of January 15th and in ignoring warning lights on its water and steam sample panel and in its control room. If CMP personnel had engaged in *any* meaningful monitoring of its steam and water quality between 8:30 p.m. and midnight on January 15, then all significant damage would have been avoided.

The Court assesses CMP's act of running a new plant at full load overnight with no effective monitoring of water and steam quality as constituting seventy-five percent (75%) of the total fault causing the damages that CMP incurred. Foster Wheeler's negligent design constituted twenty-five percent (25%) of the total fault. Under Maine's comparative negligence statute, a plaintiff adjudged to be equally or more at fault for its own damages cannot recover for negligent injury. *Wing v. Morse*, 300 A.2d 491 (Me.1973).

Accordingly, it is ORDERED that judgment be entered for Defendant Foster Wheeler.[26]

So ORDERED.

---

**25.** Foster Wheeler's design was adequate to withstand the running of the condenser at full power with leaking tubes for about three-and-a-half hours. The Court heard testimony from CMP's Sidney Shaw, who was plant maintenance supervisor at CMP on January 15, 1979, that small leaks left unrepaired grow increasingly worse. Similarly, Richard LeFebvre, BRI's resident construction manager at the Wyman plant, testified that he had been present at a power generating plant in Seawarren, New Jersey when a decision was made to run that plant despite minute leaks in its condenser tubes. LeFebvre testified that those leaks quickly increased in size. The Court concludes that leaks at the Wyman plant that were initially minute were able to grow until the tubes shattered altogether only because CMP supervisors and employees made one mistake in judgment after another and operated their plant in a highly negligent manner.

**26.** In its complaint, Foster Wheeler sought contribution from BRI. Since judgment will be entered for Foster Wheeler, the Court need not address the contribution claim.